**In the Matter of the DISSOLUTION OF ANDERSON, ZANGARI & BOSSIAN.**

**No. 2004–187–Appeal.**

Supreme Court of Rhode Island.

Jan. 13, 2006.

---

Paul A. Anderson, Carol A. Zangari, and Dennis D. Bossian.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice ROBINSON for the Court.

This is an appeal from a judgment of the Superior Court regarding a dissolution petition filed with respect to the law partnership of Anderson, Zangari & Bossian. The trial justice considered a great volume of testimonial and documentary evidence, as well as the written and oral arguments of counsel, and he then wrote a fact-filled decision reflecting his findings of fact and his assessments of credibility. One of the three parties to the now-dissolved partnership, Attorney Dennis Bossian, has appealed to this Court.

For the reasons set forth herein, we affirm the judgment of the Superior Court.

### Travel

Attorneys Paul Anderson, Carol Zangari, and Dennis Bossian orally agreed to form a law partnership that came into existence on January 1, 1995. After practicing law as partners for a few years, the three partners agreed to dissolve their partnership, with an effective dissolution date of August 31, 1999. The present controversy centers around the formula according to which the former partnership's remaining funds should be distributed to the three attorneys referred to above.[1]

---

1. The funds in question (which are still being held in escrow) amount to approximately $55,000. It is truly regrettable that a dispute among three seasoned members of the bar about such a relatively small amount could not have been resolved other than by exten-

This case was tried before a justice of the Superior Court, sitting without a jury, over the course of numerous days beginning in November 2002 and ending in April 2003. On June 3, 2003, the trial justice issued a written decision, in which he made various findings of fact regarding the nature of the Anderson, Zangari & Bossian partnership and the terms of the partnership agreement that had existed among the three partners. The trial justice's decision set forth a mechanism by which the remaining partnership funds held in escrow were to be distributed to the three former partners in accordance with his findings. Clearly dissatisfied with the Superior Court's decision, Attorney Bossian has appealed to this Court, challenging, among other things, the factual findings and credibility assessments made by the trial justice.

### Standard of Review

■ Our review of the findings of a trial justice sitting without a jury is quite deferential; this Court (like virtually all appellate courts) traditionally accords a great deal of respect to the factual determinations and credibility assessments made by the judicial officer who has actually observed the human drama that is part and parcel of every trial and who has had an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record. The criteria that control our review in this context have been cogently summarized as follows:

"The findings of fact by a trial justice sitting without a jury are entitled to great weight and shall not be disturbed on appeal unless the record shows that the findings are clearly wrong or unless the trial justice overlooked or misconceived material evidence on a controlling issue." *Burke–Tarr Co. v. Ferland Corp.*, 724 A.2d 1014, 1018 (R.I.1999). *See also Blue Cross & Blue Shield of Rhode Island v. Najarian*, 865 A.2d 1074, 1080–81 (R.I.2005); *Donnelly v. Cowsill*, 716 A.2d 742, 747 (R.I.1998); *Thomas v. Ross*, 477 A.2d 950, 953 (R.I.1984).[2]

### Analysis

In reaching a decision regarding the dissolution petition at issue in the present case, the trial justice was required to make a factual determination regarding the terms of the partnership agreement that former partners Anderson, Zangari, and Bossian entered into—and he was required to do so largely on the basis of oral testimony. After considering and weighing the plethora of testimonial and documentary evidence before him, the trial justice made factual findings, the essence of which we summarize as follows.

After being admitted to the Rhode Island Bar, Paul Anderson embarked upon a law partnership with his father, the late Charles H. Anderson, forming the firm of

---

sive (and undoubtedly expensive) litigation and then by resort to the appellate process.

**2.** In his principal brief and in his reply brief, appellant contends that the decision of the trial justice is "legally wrong." Undoubtedly, appellant is seeking to avoid the daunting challenge that he would face under the standard of review that is summarized in the quoted language from *Burke–Tarr Co. v. Ferland Corp.*, 724 A.2d 1014, 1018 (R.I.1999). Yet he has failed completely to point us to any possible error of law committed by the trial justice (with respect to which our review would of course be *de novo*). It is entirely clear from the record that the trial justice made determinations with respect to numerous factual issues and also made several assessments of credibility. This was a fact-intensive case, and the trial justice had no occasion to construe statutes or otherwise to engage in "legal" analysis. Accordingly, *de novo* review would be inappropriate in this case.

Anderson & Anderson (AA). In January of 1979, Carol Zangari joined that firm as an associate. On January 1, 1986, Charles H. Anderson withdrew from the active practice of law, and Paul Anderson and Carol Zangari formed a new law partnership. Attorney Anderson had a 60 percent interest in the new partnership, while Attorney Zangari had a 40 percent interest. The new firm of Anderson & Zangari (AZ) financed its business operations using all the money that was collected after January of 1986. This money was derived from legal work performed both before that date (by AA) and after that date (by AZ). Records were kept that differentiated revenue attributable to services rendered by AA from revenue attributable to services rendered by AZ. The partnership of AZ also purchased furnishings and equipment from AA. The agreement between AZ and AA provided that AZ would pay AA for the furniture and equipment in monthly sums and that the pre–1986 money utilized by AZ would be repaid to AA as the cash flow and resources of AZ would permit. It was further agreed that the sums due to Charles H. Anderson would be repaid more aggressively than the sums due to Paul Anderson. All agreements regarding AA and AZ were oral.

In January 1988, Dennis Bossian joined AZ as an associate. At that time, Attorney Bossian was given a base salary and a certain percentage of the fees that he generated and collected from his private clients. Just as were the agreements between AA and AZ, all agreements between AZ and Attorney Bossian were oral.

Seven years later, the partnership of Anderson, Zangari & Bossian (AZB) was formed. In determining what, if any, partnership agreement existed among the three partners, the trial justice chose to accept the view of the partnership agreement advanced by Attorney Anderson and

largely corroborated by Attorney Zangari. Under this agreement, Anderson was to receive a gross draw of $2,000 weekly ($104,000 per year); Zangari was to receive a gross draw of $1,750 weekly ($91,000 per year); and Bossian was to receive a gross draw of $1,250 weekly ($65,000 per year). The expenses of the firm were to be divided equally among the three partners. A computation would then be made in which the three gross draws would be added to the overhead to arrive at a gross figure referred to as the "partnership nut." This amount would then be divided by three to determine each individual partner's "nut." The partnership agreement further provided that, after all expenses and the three agreed-upon base draws had been paid, any partner who generated sums in excess of his or her "partner's nut" would receive 50 percent of the excess, with the remaining 50 percent being divided according to a 40/35/25 ratio to Anderson, Zangari, and Bossian, respectively.

According to the AZB partnership agreement, as described by Anderson and accepted by the trial justice, when the new partnership of AZB was first formed, the financial aspects of the change of ownership from AZ to AZB were handled using a methodology similar to that used during the change of ownership from AA to AZ. Records were kept that differentiated the revenues attributable to AZ from the revenues attributable to AZB, and balances in various AZ accounts were transferred into parallel AZB accounts. In addition, as the partners collected fees from their private cases, these fees were allocated between pre–1995 and post–1995 work.

The trial justice found that two major financial developments took place during the life of the AZB partnership. The first, referred to as the "Miller fee," was received in June of 1995 as the result of a

medical malpractice case which Attorney Zangari had handled. The trial justice found that this fee was appropriately allocated between the AZ and AZB partnerships.

The next major financial development for AZB was the resolution of the "Lehane" case, which Attorney Anderson had handled on a contingency basis. This case brought approximately $665,000 in legal fees to the firm. This money was used to bring the accounts of the three partners up to date and to repay AZ for the AZ money that AZB had used between January 1, 1995 and December 31, 1997. These calculations were made by Anderson, but were reviewed and approved by Herbert E. Harris, Esq., the accountant who had been working with the three Anderson partnerships since the time when AA was first formed. The trial justice found that the Lehane accounting was carried out accurately.

At the same time that the Lehane accounting was carried out, the 40/35/25 ratio previously employed by AZB was changed to a 1/3–1/3–1/3 formula, with each partner taking equal draws of $1,500 per week ($78,000 per year). The firm's expenses continued to be divided equally among the partners, and the 1/3–1/3–1/3 ratio would be applied to sums in excess of each partner's "nut." The trial justice found that none of the partners challenged the Lehane accounting or expressed any disagreement with it, until Bossian filed a lawsuit against Anderson one year later. The new 1/3–1/3–1/3 formula was applied to sums earned by the three partners throughout 1998 and up to June 30, 1999

when the partners went their separate ways.

■ The trial justice found that each of the three partners had expressly agreed to the partnership agreement outlined above. In addition, the trial justice concluded that each of the partners should be held to the partnership agreement because his or her conduct evidenced acquiescence to such agreement.[3] The trial justice further found that, even if no partnership agreement had existed between the parties, equity would require that the partnership be dissolved in accordance with the partnership agreement described by Anderson. As a result, the trial justice set forth a mechanism by which the remaining partnership funds held in escrow were to be distributed to the three partners in accordance with this partnership agreement.

We have carefully considered the record evidence upon which the trial justice's fact-finding and credibility assessments were based, and we perceive no reversible error in the manner in which he carried out his tasks. The factual findings made by the trial justice were well supported by the evidence before him and, therefore, certainly cannot be labeled as "clearly wrong." See Burke–Tarr Co., 724 A.2d at 1018. In choosing to accept the description of the partnership agreement advanced by Anderson and Zangari, while rejecting Bossian's contentions, the trial justice relied both upon the history of the three partnerships and Bossian's own actions.

The trial justice found that the firms had a history of oral agreements that embodied the partnership format described by Anderson. Given that both the AA and

3. In a very recent opinion, the United States Court of Appeals for the First Circuit stated that " '[t]he parties to an agreement know best what they meant,' * * * and thus the parties' subsequent course of performance may be instructive in contract interpretation." Reed & Reed, Inc. v. Weeks Marine, Inc., 431 F.3d 384, 388 (1st Cir.2005) (quoting Restatement (Second) Contracts § 202 cmt. g (1981)).

AZ partnerships employed this format, it was reasonable for the trial justice to infer that the AZB partnership was formed under a similar partnership agreement.

The trial justice also found that any misunderstanding on the part of Bossian had arisen from his own failure to inquire about the specifics of the partnership agreement; it is of more than passing significance that Bossian himself admitted that he never sought any specific information from Anderson or Zangari upon being asked to join the partnership or thereafter. The trial justice also credited testimony which showed that Bossian had known about both the Miller and Lehane accountings. Accordingly, the trial justice's conclusion that Bossian had either expressly assented to the partnership agreement or impliedly acquiesced to such agreement by his conduct was clearly supported by the evidence before him in this case.

■ The trial justice also rejected appellant's arguments (1) that the partnership tax returns are binding on the partners as indicating what the partnership agreement was and (2) that the tax returns are fraudulent. However, the trial justice concluded that the terms of the partnership agreement could not be discerned simply by examining the partnership's tax returns in isolation; he quite properly weighed *all* of the evidence that was introduced in the course of the lengthy trial of this matter. The trial justice further found that there was no evidence to support Bossian's allegations of tax fraud or other "off the book" accountings. After careful consideration of the record, we conclude that the trial justice's rulings with respect to the tax return issues were, at the very least, not "clearly wrong." *See Burke–Tarr Co.,* 724 A.2d at 1018.

The appellant has failed to direct this Court to any evidence which would indicate that any particular factual finding of the trial justice in this case was "clearly wrong." *See id.* Similarly, the appellant has failed to show that the trial justice "overlooked or misconceived material evidence on a controlling issue." *Id.* Instead, the appellant has broadly argued that the trial justice was "factually and legally wrong" without pointing to any specific alleged factual or legal errors. Although the appellant's written submissions are replete with assertions of error, we have carefully examined each of his arguments and find no basis for reversing the judgment of the Superior Court. Given the deference that appellate courts accord to findings of fact made by a trial justice sitting without a jury and the lack of evidence in the record to validate the appellant's unsupported and sometimes fatuous assertions of error, we are duty-bound to affirm the judgment of the Superior Court.

### Conclusion

For the reasons set forth in this opinion, the judgment of the Superior Court is affirmed.