DECISION
Before this Court is an action by West Bay Mortgage Company to recover the full brokerage fee it claims it earned by securing a mortgage loan commitment for the Defendant, Michael Gianfrancesco. The parties stipulated to an entry of judgment in the District Court. This Court has jurisdiction pursuant to G.L. 1956 § 8-2-14.
 I Facts Travel
During a one-day bench trial held on October 1, 2010, this Court heard the testimony of Daniel Kolenda, a mortgage broker and the sole owner of West Bay Mortgage Company, the Plaintiff in this action. Based on the testimony presented, the Court makes the following findings of fact. In 2008, Mr. Gianfrancesco approached Mr. Kolenda — who had previously helped him refinance his family restaurant and family home — and asked for his assistance on a new refinancing deal. Mr. Gianfrancesco wanted to help his daughter purchase a two-family investment property and hoped to take out a second mortgage on his home in order to obtain the funds necessary for a down payment. However, based on Plaintiff's representation that *Page 2 
Defendant's credit score precluded him from obtaining a second mortgage, the Defendant decided to refinance his primary residence.[1]
On September 11, 2008, Mr. Gianfrancesco signed a Mortgage Brokerage Business Contract, and in so doing employed West Bay Mortgage Company "to obtain a mortgage loan commitment." (Mortgage Brokerage Business Contract; Pl.'s Ex. 2 [hereinafter "Contract"].) By the terms of the contract, West Bay Mortgage was engaged to obtain a $330,000 loan with an interest rate of $6.250%. On the same day the contract was signed, Mr. Kolenda provided Mr. Gianfrancesco with a "Good Faith Estimate," detailing the expenses and charges associated with obtaining the mortgage. (Def.'s Ex. B.)
To obtain a loan commitment, Mr. Kolenda performed work such as obtaining an application, credit report, and appraisal, conducting title research, checking various lending institutions' interest rates, and gathering all the documents and information required to obtain a commitment from a lending institution. Ultimately, Sovereign Bank offered the best deal: a $309,000 loan at an interest rate of $6.875%. Given the state of the economy and rising interest rates, Mr. Gianfrancesco took Mr. Kolenda's advice and decided to lock in the loan. On October 24, 2008, Sovereign Bank issued a clear to close letter, which outlined the terms of the loan and served as an assurance that the lender had received all proper documentation necessary for closing the loan. A commitment letter from the lending institution was sent directly to the borrower, Mr. Gianfrancesco.[2]
Mr. Kolenda testified that throughout the process Mr. Gianfrancesco was very eager to proceed with the transaction. Mr. Kolenda had worked for Mr. Gianfrancesco previously, and *Page 3 
knew that he was motivated to get his daughter and her family into their own home. The Defendant's wife, Nicolina Gianfrancesco, who owned the Mathewson Street property with her husband, helped gather some of the documentation required for the refinancing. However, the day before the closing when Mr. Kolenda told Mr. Gianfrancesco that everything was all set to go, he was unaware that Mr. Gianfrancesco was having any doubts about proceeding with the transaction. Therefore, it came as a surprise when Mr. Kolenda received a telephone message the following morning in which Mr. Gianfrancesco stated that he would not complete the closing. Mr. Gianfrancesco failed to provide a reason for refusing to close on the loan.
Mr. Gianfrancesco's obligation to pay West Bay Mortgage is based on the terms of the Mortgage Brokerage Business Contract he signed. In exchange for "assembling information, compiling files and completing credit application for borrower(s), processing the application file including verifying of information received and ordering vendor reports, preparing and submitting the completed file for conditional loan commitment between borrower(s) and lender, and any incidental services necessary to obtain commitment . . .," the mortgage broker is entitled to earn a fee. (Contract, ¶ VI.) Specifically the borrower:
 agrees to pay the actual costs as estimated herein and Borrower agrees to pay Business a mortgage brokerage fee of $3,300.00 for obtaining the commitment. Additionally, Borrower acknowledges that Business may receive additional compensation from Lender based on the mortgage program and terms Borrower has engaged Business to obtain in securing the commitment and that Business will receive a sum in range of 0.000% to 3.000% of the total loan amount. This additional compensation, the exact amount of which will be disclosed at the time of closing, is part of the total brokerage fee due Business. Id. at ¶ III.
If the borrower "in any way fails to comply with this Agreement", the Contract states that the borrower "acknowledges that the full brokerage fee has been earned . . . and agrees to immediately pay same plus any and all costs incurred on Borrower's behalf."Id. at 2. At trial, *Page 4 
Mr. Kolenda stated that the "full brokerage fee" includes a Yield Spread Premium. Additionally, the Contract entitles West Bay Mortgage to recover "all costs incurred, including attorney's fees," in the event of litigation. Id.
 II Standard of Review
Pursuant to Rule 52 of the Rhode Island Superior Court Rules of Civil Procedure, "[i]n all actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its conclusions of law thereon. . . ." Super. R. Civ. P. 52(a). In accordance with this rule, "[i]n a non-jury trial, the trial justice sits as the trier of fact as well as of law." Parella v. Montalbano,899 A.2d 1226, 1239 (R.I. 2006) (quoting Hood v. Hawkins,478 A.2d 181, 184 (R.I. 1984)). "Consequently, he weighs and considers the evidence, passes upon the credibility of witnesses, and draws proper inferences." Id. The factual determinations and credibility assessments of a trial justice "traditionally accords a great deal of respect . . . [because it is] the judicial officer who actually observe[s] the human drama that is part and parcel of every trial and who has had the opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record." In reAnderson, Zangari Bossian, 888 A.2d 973, 975 (R.I. 2006). The Rhode Island Supreme Court has recognized that "a trial justice's analysis of the evidence and findings in the bench trial context need not be exhaustive, and if the decision reasonably indicates that he exercised his independent judgment in passing on the weight of the testimony and the credibility of the witnesses it will not be disturbed on appeal unless it is clearly wrong or otherwise incorrect as a matter of law." Notarantonio v.Notarantonio, 941 A.2d 138, 144-45 (R.I. 2008) (quotingMcBurney v. Roszowski, 875 A.2d 428, 436 (R.I. 2005)). Although the trial justice is required to make specific findings of fact, *Page 5 
"brief findings will suffice as long as they address and resolve the controlling factual and legal issues." White v. Le Clerc,468 A.2d 289, 290 (R.I. 1983).
 III Analysis A Regulation Z
Both parties spent considerable time discussing the extent to which Regulation Z applies to this case. The Truth in Lending Act vests the Federal Reserve Board with power to promulgate regulations regarding the interpretation and implementation of the Act, and inMourning v. Family Publications Service, Inc.,411 U.S. 356 (1973), the United States Supreme Court upheld the delegation of this authority. The Federal Reserve Board's regulations set forth at 12 CFR § 226, are commonly known as "Regulation Z." See In re Rodrigues,278 B.R. 683, 686-87 (Bankr. D.R.I., 2002). In part, Regulation Z protects borrowers who refinance their principal dwelling by allowing them to rescind without consequence for three days following a closing; but, it provides no protection to a borrower who does not complete the transaction. See12 CFR § 226.23 (a)(1) and (3) (2003).
If Mr. Gianfrancesco had completed the refinancing, the protection afforded by Regulation Z would have given him three days following the closing in which to rescind. However, by backing out of the transaction before the closing, the Defendant loses the protection of Regulation Z. Although it is troubling that a borrower in this situation would not be afforded any protection, it is not within this Court's purview to extend the federal consumer protection laws. Therefore, where the borrower signed a contract and the brokerage business upheld its side of the bargain by obtaining a mortgage loan commitment from a reputable lender, the narrow *Page 6 
question before the Court is the size of the commission the borrower is liable to pay in the absence of a defense for his breach.
 B Breach
A mortgage broker rarely sues a borrower who does not complete a scheduled closing. In fact, during the trial, Mr. Kolenda acknowledged that this was the first time he had commenced a lawsuit, despite the fact that more than half of the loan commitments he secures are never funded. In general, the "liability of a proposed borrower to a mortgage broker for securing a loan commitment is governed by the same principles which apply in determining the liability of a seller to a real estate agent for the commission earned by having produced a buyer ready, willing and able to purchase the listed property." Don J. McMurrayCo. v. Wiesman, 260 N.W.2d 196, 200 (Neb. 1977). It follows that "in the absence of a special agreement to the contrary, the right of a broker to a commission, where the deal he is authorized to negotiate is not consummated, depends upon his production of a customer who is able, ready, and willing to make the desired loan upon terms satisfactory to the principal." Id. Thus, a mortgage broker "does not . . . lose his right to an earned commission because the loan is not consummated on account of the unjustified failure or refusal of the principal to complete the transaction." Id. See also Freiwald v. Fid. Interstate Cas.Co., 138 A.2d 146, 148 (Pa. Super. 1958) ("a mortgage broker earns his commission, as a rule, when he secures a commitment for the mortgage even though the transaction is not completed, especially when the failure of completion is due solely to the fault of the proposed mortgagor.")
Here, the Mortgage Brokerage Business Contract requires the borrower to pay a "mortgage brokerage fee" for "obtaining the commitment." (Contract, ¶ III.) West Bay *Page 7 
Mortgage adhered to the Contract terms and obtained a commitment from Sovereign Bank. Therefore, based on the terms of the Contract and similar interpretation by other state courts that a mortgage broker earns his commission when he secures a loan commitment even if the loan is not consummated, this Court finds that Mr. Gianfrancesco must compensate West Bay Mortgage for the work it performed. Additionally, because Mr. Gianfrancesco made a verbal commitment to lock-in the $309,750 loan at an interest rate of 6.875% offered by Sovereign Bank, he acted in a manner indicating his acceptance of the approved loan amount and interest rate and waived the argument that West Bay Mortgage failed to secure a mortgage that matched the terms of the Mortgage Business Brokerage Contract.
 C Yield Spread Premium
West Bay Mortgage asserts that it is entitled to recover the "full brokerage fee," which includes a $5,033.44 Yield Spread Premium. Although the "Default" provision of the Mortgage Brokerage Business Contract provides that in the event of default, the borrower "acknowledges that the full brokerage fee has been earned by Brokerage Business and agrees to immediately pay same plus any and all costs incurred on Borrower's behalf," what constitutes a "full brokerage fee" is not defined in the Contract.Id. at 2 (emphasis added). In contrast, the "Mortgage Brokerage Fee" provision states clearly, and unambiguously, that the borrower "agrees to pay Business a mortgage brokerage fee of $3,300.00 for obtaining the commitment."[3]Id. at ¶ III (emphasis added)). The provision goes on to state that the "Business will receive a sum in range of 0.000% to 3.000% of the total loan amount" from the lender and that "[t]his additional *Page 8 
compensation, the exact amount of which will be disclosed at the time of closing, is part of the total brokerage fee due business."Id. (emphasis added).
The Court finds that the "mortgage brokerage fee" of $3,097.50 was earned by West Bay Mortgage when it obtained the loan commitment from Sovereign Bank, and is the component of the brokerage fee for which Mr. Gianfrancesco should expect to compensate West Bay Mortgage. The question that remains is whether the $5,033.44 Yield Spread Premium was a foreseeable consequence of the breach. A Yield Spread Premium is a premium that lenders pay to mortgage brokers at closing. During the trial, Mr. Kolenda admitted that the term "Yield Spread Premium" did not appear in the Contract, but stated that it was a component of the "full brokerage fee," which Defendant was responsible for paying in the event that he defaulted.
However, this Court is not convinced that the Yield Spread Premium — which in this case is nearly twice as large as the mortgage brokerage fee — should be attributable to the Defendant. "[I]t is well settled that a court may award damages for breach of contract to place the injured party in as good a position as if the parties fully performed the contract."Riley v. St. Germain, 723 A.2d 1120, 1122 (R.I. 1999). However, "the test of a defendant's liability as to damages other than those which reasonably arise from the breach depends upon whether such damages were, or reasonably should have been, foreseen by the defendant at the time the contract was made." George v.George F. Berkander, Inc.,92 R.I. 426, 431, 169 A.2d 370, 372 (1961).
Another tenant of contract law repeatedly stated by our Supreme Court is that an ambiguity exists if a contract provision is "reasonably susceptible of different constructions." Paul v.Paul, 986 A.2d 989, 993 (R.I. 2010). To make a determination of ambiguity, the Court "view[s] the agreement in its entirety and give[s] to its language its `plain, ordinary and usual meaning.'"Id. (quoting Vickers Antone v. Vickers,610 A.2d 120, 123 (R.I. 1992)). When a *Page 9 
trial justice determines that ambiguity is present, he "should adopt that construction which is most equitable and which will not give one party an unconscionable advantage over the other."Massasoit Housing Corp. v. Town of N. Kingstown,75 R.I. 211, 216, 65 A.2d 38, 40 (1949). Additionally, "it is necessary to examine both the circumstances surrounding the development of the ambiguous terms and the intentions of the parties." Paul, 986 A.2d at 995 (internal citation and quotations omitted).
A Yield Spread Premium is generally linked to the interest rate of a loan so that "the higher the rate is above par, the higher the yield spread premium payment to the mortgage broker." Peter J. Hong and Marcos Reza, Hidden Costs to Homeowners: The PrevalentNondisclosures of Yield Spread Premiums in Mortgage LoanTransactions, 18 Loy. Consumer L. Rev. 131, 133 (2005). Although mortgage brokers are required to disclose Yield Spread Premiums, there is evidence that current disclosures are not sufficient. For example, although a range of 0-3% was found to be acceptable disclosure by the Oregon Department of Consumer and Business Services, this "range does not provide the borrower with a close estimate of the actual yield spread premium paid to the broker" because on a $300,000 loan, the estimated Yield Spread Premium may fall anywhere between $0 and $10,000. Id. at 137-38. Additionally, this "obscure form of disclosure is not sufficient to enable [a] borrower to make an informed credit decision."Id. at 147.
The Federal Reserve Board, tasked with implementing the Truth In Lending Act, has also found evidence that Yield Spread Premium disclosures are often inadequate. In fact, in consumer testing, the Board found that "consumers are generally not aware of the payments lenders make to loan originators and how those payments can affect the consumer's total loan cost." Press Release, Federal Reserve (August 16, 2010). Therefore, to help "protect mortgage *Page 10 
borrowers from unfair, abusive, or deceptive lending practices," the Federal Reserve Board announced that beginning in April 2011, brokers will not be able to receive compensation based on a loan's interest rate or other terms, and brokers who receive compensation directly from the consumer will not be able to receive additional compensation from a lender or another party.Id. Thus, moving forward, Yield Spread Premiums will no longer be permitted.
Here, the Mortgage Business Brokerage Contract did not define the items that made up the "full brokerage fee." The Contract disclosed a 0-3% range of additional compensation that the mortgage broker would receive from the lender at the closing, and explained that "this additional compensation, the exact amount of which will be disclosed at the time of closing, is part of the total
brokerage fee due Business." (Contract, ¶ III.) Given this vague disclosure and evidence that consumers are generally unaware of this additional compensation that mortgage brokers receive from lenders, the Court finds that Mr. Gianfrancesco could not reasonably foresee being liable for the Yield Spread Premium as a consequence of his breach.
Additionally, the disclosure here is not only ambiguous but inherently misleading. The two fees are discussed separately within the paragraph and as to the Yield Spread Premium fee, it explicitly states that this fee will be "disclosed at the time of closing."Id. To the average mortgage recipient, it is certainly reasonable to assume that this fee does not arise if there is no closing. Moreover, by the terms of the Contract, the amount of the Yield Spread Premium is unknown when the consumer entered the Contract and the circumstances upon which it becomes the consumer's obligation are uncertain.
The Court also finds that the provision requiring the borrower to compensate the Broker for the yield spread premium is unconscionable. The doctrine of unconscionability protects against unfair bargaining between parties in disparate positions.See 17A Am. Jur. 2d Contracts § 277 (2010). *Page 11 
In the mortgage brokerage industry, it is clear that borrowers have no knowledge of the relationship and fees generated between mortgage brokers and lending institutions. This is evidenced by the Federal Reserve Board's decision to prohibit such fees as of April 1, 2011. See Press Release, Federal Reserve (August 16, 2010).
Here, it is clear that Mr. Gianfrancesco had no knowledge or understanding of the Yield Spread Premium because the language in the Contract imposing liability on the borrower for this fee is both ambiguous and misleading. Furthermore, there is no indication that this fee was ever discussed with Mr. Gianfrancesco. Consequently, the Court finds that enforcement of the Yield Spread Premium in this matter would be unconscionable.
 D Attorney's Fees
The Rhode Island Supreme Court "has long held that attorney's fees may not be awarded as a separate item of damages absent contractual or statutory authorization." Farrell v. Garden City Builders,Inc., 477 A.2d 81, 81-82 (R.I. 1984). Here, the contract meets this requirement and allows West Bay Mortgage to recover "all costs incurred, including attorney's fees" in the event of litigation. (Contract, 2). The Court will consider the Plaintiff's request upon submission of an affidavit in conformity with ColonialPlumbing Heating Supply Co. v. Contemporary Constr. Co.,Inc.. 464 A.2d 741, 743 (R.I. 1983).
 IV Conclusion
With respect to Mr. Gianfrancesco's counterclaim alleging breach of contract, breach of fiduciary duty, and misrepresentation, these claims are denied. The Court finds no evidence was offered by the Defendant in support of these claims. With respect to West Bay Mortgage *Page 12 
Company's claim, this Court finds that by backing out of the closing at the eleventh hour, Mr. Gianfrancesco breached the Mortgage Brokerage Business Contract and is required to pay the $3,097.50 mortgage brokerage fee as well as the reasonable costs incurred by West Bay Mortgage in securing the loan commitment. The Defendant is not ordered to pay the $5,033.44 Yield Spread Premium, as this Court finds the provision, including this fee as a component of damages, to be ambiguous, misleading, and unconscionable. Counsel shall submit the appropriate order for entry.
[1] Evidence was presented that the Defendant may have been eligible to obtain a second mortgage in the subprime market. However, West Bay Mortgage did not offer subprime mortgages.
[2] The commitment letter was not presented as evidence. The Court accepts Mr. Kolenda's testimony that the two letters are always sent at the same time.
[3] The Plaintiff is now seeking a mortgage brokerage fee of $3,097.50 or 1.000% of the loan commitment offered by Sovereign Bank. *Page 1