**B.S. INTERNATIONAL LTD.**

v.

**JMAM, LLC.**

**No. 2009–72–Appeal.**

Supreme Court of Rhode Island.

Feb. 16, 2011.

Richard C. Tallo, Esq., Providence, for Plaintiff.

Timothy J. Robenhymer, Esq., Warwick, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice ROBINSON for the Court.

This case arises out of a contractual dispute between two commercial entities. The plaintiff, B.S. International, Ltd., appeals from a Superior Court judgment entered in favor of the defendant, JMAM, LLC. B.S. International contends that the trial justice's factual findings with respect to the contract governing the relationship between the parties were erroneous.

This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the record, the memoranda submitted by the parties, and the oral arguments of counsel, we are of the opinion that cause has not been shown and that the case should be decided at this time.

For the reasons set forth below, we affirm the judgment of the Superior Court.

## I

### Facts[1] and Travel

At the time that the dispute between the parties arose, plaintiff, B.S. International, was a manufacturer of costume jewelry. The defendant, JMAM, LLC, is a wholesaler of costume jewelry and beauty products—doing business as "Joan Rivers Worldwide Enterprises." (We shall hereinafter refer to defendant simply as JMAM.)

At some point in the early 1990s, B.S. International entered into a business relationship with JMAM, pursuant to which B.S. International would manufacture costume jewelry for JMAM. In turn, JMAM would sell the costume jewelry to various customers, but primarily to QVC, Inc.[2]

The dispute that gave rise to the instant litigation centers around the contractual agreement between the parties with respect to rejected merchandise. More specifically, the ultimate issue is whether or not JMAM is entitled to reimbursement from B.S. International for merchandise rejected by QVC due to customer dissatisfaction, even though that rejected merchandise was not actually returned to B.S. International.

The parties are in essential agreement as to the basic *practice* that existed prior to February of 2004 with respect to rejected merchandise: merchandise rejected by QVC would be sent to a third party, REL Consulting (REL).[3] Upon receiving the rejected merchandise, REL would sort it and allocate the rejected merchandise to the appropriate vendor-manufacturers.[4] REL would then ship to each vendor its

---

1. The facts set forth in this opinion have been adduced from the testimony and evidence presented at trial.

2. In the "About QVC" section of its website, QVC, Inc., describes itself as "one of the largest multimedia retailers in the world * * *." QVC (Feb. 14, 2011), http://www.qvc.com.

3. Ronald Lague, the self-employed owner of REL, testified that his business was referred to as "REL Consulting" from 1991 to 2001 and as "REL Consulting, Inc." from 2001 to the time of trial in June of 2008. We shall hereinafter refer to said entity simply as REL.

4. B.S. International was one of numerous manufacturers from whom JMAM purchased costume jewelry for subsequent sale to QVC.

portion of the rejected merchandise. JMAM would thereafter take a "charge-back" or credit against future invoices to account for the value of the returned goods.[5]

Until 1998, the working relationship between B.S. International and JMAM was governed solely by oral agreements. In 1998, however, JMAM developed written terms and conditions to be applied to "all accepted purchase orders." In December of that year, Stephen Baracsi,[6] the owner and president of B.S. International, signed the cover letter that accompanied those terms and conditions and returned the letter to JMAM, indicating his "[agreement] to those 'terms and conditions' for all accepted purchase orders."[7]

On January 30, 2004, JMAM notified its vendors by letter that the policies and procedures concerning "Customer Defective Returns"[8] would change in February of that year. B.S. International and JMAM agreed, however, that the new policy announced in the January letter would not apply to purchase orders that had already been placed prior to the date of the announcement of the policy change.

(Since the case at bar concerns rejected merchandise excluded by their agreement from the reach of the prospective policy change, the details of that policy change are of no relevance to this appeal.)

After the above-referenced policy change became effective, a dispute arose between the parties regarding the amounts owed pursuant to purchase orders that were placed prior to the date of the announcement of the policy change. B.S. International claimed that it was owed a substantial amount of money for goods previously sold to JMAM. For its part, JMAM sought to obtain a payment from B.S. International with respect to certain rejected merchandise—even though that merchandise had not actually been returned to B.S. International.

On November 5, 2004, B.S. International commenced a civil action against JMAM in the Superior Court for Providence County, alleging, in pertinent part, that JMAM owed B.S. International $41,294.21 for goods sold and delivered to JMAM during calendar years 2003 and 2004. Thereafter, JMAM filed an answer and a counterclaim; in the counterclaim, JMAM alleged, in per-

Since the parties frequently refer to those manufacturers as JMAM's "vendors," we shall hereinafter do the same.

5. Whether or not JMAM relied on counting and sorting by REL in order to determine how much each vendor would owe JMAM for the rejected merchandise was disputed at trial. Mr. Lague (the owner of REL) testified that he prepared credit memoranda for each vendor, which credit memoranda formed the basis of the credits that JMAM would take against future purchase orders. However, James Halliday, the chief financial officer of JMAM, testified that the credits that JMAM took were based upon the credits that QVC would take against JMAM. We note this factual disagreement for the sake of completeness; but, after due consideration, we deem this issue to be irrelevant with respect to the instant appeal.

6. On occasion, Mr. Baracsi's surname appears in the record as "Barasci." However, both parties to this appeal spell that name as "Baracsi," and we shall do likewise.

7. At trial, Mr. Baracsi of B.S. International testified that, when he mailed back to JMAM the signed letter and the terms and conditions document, he added an additional term pertaining to the return of rejected merchandise. Whether or not Mr. Baracsi actually did so was a contested issue at trial, and it is a subject that we shall address later in this opinion.

8. In the same letter, JMAM defined "Customer Defective Returns" as "items that have been returned from QVC customers and considered by QVC to be Customer defective returns."

tinent part, that B.S. International owed JMAM $13,760.44.

On June 24 and 25, 2008, a trial was held before a justice of the Superior Court sitting without a jury. On October 27, 2008, the trial justice rendered a decision in favor of JMAM. On November 3, 2008, judgment was entered (1) for defendant on plaintiff's complaint, dismissing the complaint with prejudice; and (2) for defendant on its counterclaim in the amount of $13,760.44. On November 20, 2008, plaintiff filed a timely notice of appeal.

## A

### Relevant Testimony and Evidence Presented at Trial

The only issue before us on appeal is what terms and conditions governed merchandise that was rejected before the policy change would become effective in February of 2004. More specifically, the issue is whether or not JMAM was entitled to reimbursement from B.S. International for rejected merchandise, even though that merchandise was not actually returned to B.S. International.

At trial, two documents offered by plaintiff were admitted as full exhibits, *viz.*, Exhibits 1A and 1B. The nub of the disagreement between the parties is the question of which of those two documents constitutes the actual written agreement made between the parties in 1998. The two

documents both contain a cover letter drafted by JMAM,[9] which, in Exhibit 1B, is signed by Stephen Baracsi on behalf of B.S. International.[10] In both documents, the cover letter is followed by virtually identical terms and conditions, with the significant exception of an additional sentence which is typewritten on the bottom of the terms and conditions page of Exhibit 1B only. The additional typewritten[11] provision reads as follows:

> "PS: B.S. International will NOT ACCEPT CREDIT unless broken mds. will be returned and inspected by R.E.L. Consulting!!!"

Since it is undisputed that the rejected merchandise at issue was not in fact "returned and inspected by R.E.L. Consulting," the trial justice was called upon to determine whether or not the above-quoted typewritten provision actually was part of the contractual agreement between the parties, such that B.S. International was not required to reimburse JMAM for the merchandise.

### 1. The Testimony of Stephen Baracsi

Stephen Baracsi of B.S. International testified at trial regarding Exhibit 1B. It was Mr. Baracsi's testimony that Exhibit 1B constituted the agreement between the parties prior to February of 2004. He testified that, in December of 1998, he added the above-referenced typewritten

---

9. We note that the cover letters contained in the two exhibits are signed by different employees of JMAM, but this fact is of no relevance to the dispute between the parties.

10. The text of the cover letter reads in pertinent part as follows:
"Our computer generated purchase orders do not have terms & conditions printed on the back as our manual purchase orders did.
"Attached is a copy of the terms and conditions that our orders are subject to. By

signing below, you the vendor, agree to those terms and conditions for all accepted purchase orders." (Internal quotation marks omitted.)

11. By "typewritten," we mean to indicate that this additional provision is visually distinct from the rest of the document—in both type font and size. While the original document appears to have been created by a word processor, the typewritten provision appears to have been produced using a typewriter.

provision to the end of the terms and conditions document (which had been sent to B.S. International by JMAM); he stated that he signed the first page (the above-referenced cover letter) and then *mailed* both pages back to JMAM.

On cross-examination, Mr. Baracsi was confronted with defense Exhibit A (not to be confused with the above-referenced plaintiff's Exhibit 1A). Mr. Baracsi identified that exhibit as a copy of the terms and conditions cover letter, signed by him, preceded by a facsimile cover sheet prepared by his secretary.[12] He testified that his secretary *faxed* a signed copy of the cover letter to JMAM. Mr. Baracsi acknowledged, however, that the secretary faxed only the first page of Exhibit 1B (the signed cover letter) and did not fax the second page (the terms and conditions document), which he said included the above-quoted typewritten additional language dealing with the return and inspection of "broken" merchandise. It was Mr. Baracsi's testimony that the terms and conditions page of Exhibit 1B was not faxed because "[they] are busy;" he also acknowledged that his secretary "could have [sent] it but she did not send it."

### 2. The Testimony of James Halliday

James Halliday, chief financial officer of JMAM, testified that he began his employment with JMAM in 2002. He stated that, when he first assumed his position at JMAM, he reviewed all of the documents in the company's files pertaining to each vendor. It was Mr. Halliday's testimony that the first time he saw the second page of Exhibit 1B (the page that contains the typewritten "PS") was during the course of the instant litigation.

Mr. Halliday further testified that the practice between JMAM and its various vendors was to return "customer defective returns" to the vendors; however, he testified that JMAM did so as an "accommodation." He explained the practice in further detail as follows:

> "When I came on, the prevailing thought was that vendors would take a look at the items to see if there were any unusual returns or anything. * * * It really didn't have anything to do with the conditions of charging them back for returns."

It was Mr. Halliday's testimony that Exhibit 1A (*i.e.*, the exhibit that does not contain the additional typewritten provision that appears on Exhibit 1B) expressed the agreement between the parties prior to February of 2004.

### B

### The Findings of Fact and the Ruling of the Trial Justice

On October 27, 2008, the trial justice rendered a bench decision in which he found in favor of JMAM on all issues. As predicates for his final ruling, the trial justice made a number of findings of fact and credibility determinations.

Of particular relevance to the instant appeal, the trial justice made findings of fact regarding the terms and conditions that governed the relationship between the parties prior to February of 2004. The trial justice found that there had been no written agreement between the parties prior to 1998, at which time JMAM sent to its vendors (including B.S. International) a purchase order which set forth the governing terms and conditions. He further

---

**12.** The facsimile cover sheet reads in pertinent part as follows:

"ATTACHED IS A SIGNED COPY OF THE 'TERMS & CONDITIONS' SUBJECT TO YOUR PURCHASE ORDERS. "ORIGINAL IS IN THE MAIL."

found that the record reflected that the cover letter to the purchase order, containing the terms and conditions, was signed by the principal of B.S. International, Stephen Baracsi.

The trial justice then addressed Mr. Baracsi's testimony concerning the typewritten provision on the second page of Exhibit 1B. He specifically found that "the testimony of the principal of B.S. was *not credible* in this regard * * *." (Emphasis added.) The trial justice further stated that he did "not find that that legend or [a] document with that legend was returned to [JMAM]."[13] Having made that credibility determination concerning Mr. Baracsi's testimony, the trial justice then found that the terms and conditions that governed the relationship between the parties were as set forth in Exhibit 1A.

The trial justice expressly noted that it was B.S. International's contention that "goods representing * * * offsets never were returned [and that,] therefore, there should be no credit to [JMAM] with respect to those items." However, having determined that Exhibit 1A expressed the agreement between the parties, the trial justice stated that "the arrangement * * * contemplated a full credit to [JMAM] for all goods that were returned by [JMAM's] customer, QVC." He proceeded to "net the amounts" that the parties claimed were owed to each, and he determined that B.S. International owed JMAM $13,760—even though "[t]hose goods were, in fact, not returned to B.S."

## II

### Standard of Review

■■■■ We apply a deferential standard of review with respect to the factual findings of a trial justice sitting without a jury in a civil case. *Costa v. Silva,* 996 A.2d 607, 611 (R.I.2010); *Grady v. Narragansett Electric Co.,* 962 A.2d 34, 41 (R.I. 2009); *In re Dissolution of Anderson, Zangari & Bossian,* 888 A.2d 973, 975 (R.I.2006). This Court "traditionally accords a great deal of respect to the factual determinations" made by the trial justice. *In re Dissolution of Anderson, Zangari & Bossian,* 888 A.2d at 975.

■■■■ It is self-evident that a trial justice sitting without a jury must often make credibility determinations in order to arrive at the necessary findings of fact. We accord a substantial amount of deference to those determinations, due to the fact that the trial justice "has actually observed the human drama that is part and parcel of every trial and * * * has had an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record." *In re Dissolution of Anderson, Zangari & Bossian,* 888 A.2d at 975; *see also In re Richard A.,* 946 A.2d 204, 209 (R.I.2008); *Rodriques v. Santos,* 466 A.2d 306, 309 (R.I.1983) ("On appeal we do not consider arguments that certain evidence is more credible than other evidence. That is a function of the trial court.").

■■■■ As we have repeatedly and clearly stated, we will not disturb factual findings "unless the record shows that the findings are clearly wrong or unless the trial justice overlooked or misconceived material evidence on a controlling issue." *In re Dissolution of Anderson, Zangari & Bossian,* 888 A.2d at 975; *see also Costa,* 996 A.2d at 611; *Grady,* 962 A.2d at 41.

---

**13.** The trial justice used the term "legend" to refer to the additional typewritten provision that appears in Exhibit 1B.

■ The interpretation of an unambiguous contract is a question of law. *See Clark–Fitzpatrick, Inc./Franki Foundation Co. v. Gill*, 652 A.2d 440, 443 (R.I. 1994) ("Contract interpretation is a question of law; it is only when contract terms are ambiguous that construction of terms becomes a question of fact."); *see also Dubis v. East Greenwich Fire District*, 754 A.2d 98, 100 (R.I.2000). As such, our review is *de novo*. *1800 Smith Street Associates, LP v. Gencarelli*, 888 A.2d 46, 52 (R.I.2005); *see also Haffenreffer v. Haffenreffer*, 994 A.2d 1226, 1231 (R.I.2010); *Resare v. Resare*, 908 A.2d 1006, 1009 (R.I. 2006); *Zarrella v. Minnesota Mutual Life Insurance Co.*, 824 A.2d 1249, 1259 (R.I. 2003).

### III

### Analysis

After a careful review of the record and the appellate arguments of the parties, we perceive nothing that suggests that the trial justice overlooked or misconceived material evidence or that his factual findings were clearly erroneous. *See Grady*, 962 A.2d at 41. The dispute between the parties ultimately amounted to a "he-said, he-said" dispute regarding the existence *vel non* of a typewritten provision at the bottom of the "terms and conditions" document that plaintiff claims was mailed back to JMAM. Such a dispute implicates a pure issue of credibility.

■ Based upon our review of the testimony presented at trial, it is our opinion that the trial justice did not clearly err in determining that Mr. Baracsi's testimony regarding the authenticity of the typewritten provision on Exhibit 1B was not credible. Since Mr. Baracsi was unable to produce any corroborating evidence that the purported modification (*i.e.*, the typewritten modification) had been communicated to or assented to by JMAM, it was not unreasonable for the trial justice to determine that such had never happened. It was also not clearly erroneous for the trial justice to decline to accept as credible Mr. Baracsi's assertion that his secretary had promptly faxed the signed terms and conditions cover sheet back to JMAM, yet had failed to also fax the page with the modification or communicate to JMAM that a modification would be forthcoming in the mail. Since we perceive no error in the trial justice's determination that the testimony regarding the purported modification was not credible, it follows as the night the day that there was no error in the trial justice's finding that Exhibit 1A expressed the agreement governing the relationship between the parties at the time relevant to this appeal.

Finding no fault with the trial justice's factual determinations, we now turn our attention to the terms and conditions contained in Exhibit 1A. Our *de novo* review of same has caused us to conclude that there are no provisions requiring the return of rejected merchandise to B.S. International. Section 3 of the terms and conditions of Exhibit 1A, entitled "INSPECTION AND PAYMENT," is the only provision concerning rejected merchandise. It provides in pertinent part: "Defective Articles will be rejected by the *Buyer* [*i.e.*, JMAM] and the prices thereof will be debited against the account of the seller." (Emphasis added.) There is nothing in Exhibit 1A to suggest that the return of goods was a prerequisite to JMAM's entitlement to reimbursement.

Accordingly, since there is no provision in the above-mentioned terms and conditions as set forth in Exhibit 1A that would require that JMAM return rejected merchandise to B.S. International in order to obtain reimbursement with respect to such

merchandise, the trial justice properly found in favor of JMAM.

Finally, we have reviewed the trial justice's mathematical calculations, bearing in mind his above-summarized credibility determinations and findings of fact, and we perceive no error.

## IV

### Conclusion

For the reasons set forth in this opinion, the judgment of the Superior Court is affirmed. The record may be returned to that tribunal.