DECISION
This controversy was tried to the Court without a jury. The essential issue in this case is whether the money for which Plaintiff David Vogel ("Plaintiff" or "Vogel") is seeking repayment from Defendant Juan Catala ("Defendant" or "Catala") was "knowingly lent for . . . gaming or betting[;]" and, if so, whether the contract is enforceable. As a threshold issue, however, the Court first must engage in a conflict of laws analysis to determine whether application of Rhode Island Law is appropriate. Jurisdiction is pursuant to G.L. 1956 § 8-2-14.
 I Summary of the Testimony and Travel
Vogel and Catala are legal residents of Rhode Island. In early April 2007, Catala traveled to Nevada with his fiancée for a previously planned trip to Las Vegas. On or about April 9, 2007, Catala placed a telephone call from Nevada to Vogel in Rhode Island. The subject of that telephone call is in dispute, with each party proffering a different version of the telephone conversation and ensuing events. Accordingly, the Court will set forth the pertinent evidence produced by each side during the course of the *Page 2 
trial. Thereafter, the Court will determine the pertinent facts by making the credibility determinations necessary for the court's findings of fact.
 A. Summary of the Facts Presented by Plaintiff
Vogel testified that sometime in 2006, he met Catala at a poker table at the Foxwoods Casino in Connecticut. Thereafter, they became friends. He stated that at one point before the April 9, 2007 telephone conversation, Catala requested that he pay a $100 entrance fee for a poker tournament at Foxwoods, and that Catala would pay back the loan upon his arrival at the casino. Catala paid back the loan in accordance with the verbal agreement.
Vogel then testified that during the April 9, 2007 telephone conversation, Catala informed Vogel that he had lost substantial sums of money in Las Vegas and requested that Vogel lend him $10,000 so that he could recoup his earlier gambling losses. Vogel stated that although Catala indicated that he wanted the money to recoup his earlier losses, Vogel considered the advance of the money to be a "straight loan" and not a loan made for the purpose of gambling. He further stated that he believed Catala needed cash because his friend had extended his trip and had purchased a diamond ring for his fiancée. Vogel was not concerned about Catala's ability to repay the loan because Vogel knew of Catala's financial condition, including Catala's ownership of rental properties and the fact that he had a well paying job.
When Vogel told Catala that he would be unable to lend him $10,000, Catala requested Vogel to send as much as he could afford. Thereafter, the two settled on $8500 as the amount that Vogel was willing to wire to Catala. Vogel stated that Catala *Page 3 
indicated that he would repay the loan within two weeks of his receiving the money. In furtherance of this conversation, Plaintiff stated that later on April 9, 2007, he caused the sum of $8500 to be transferred to Catala from his Rhode Island bank account to Catala, c/o The Bellagio Hotel in Las Vegas, Nevada.
Catala did not repay the loan despite Vogel requesting repayment several times. Vogel then testified that he sent a notice of collection to Catala and that Catala responded first by denying that he had received a loan, and then by claiming that Vogel had given him the money as part of a business arrangement involving poker tournaments. Thereafter, Vogel filed the instant action.
 B. Summary of Facts Presented by Defendant
Catala testified that the $8500 cash advance from Vogel was not a loan; instead, he said the money was advanced in furtherance of an oral "business arrangement" between the two parties. According to Catala, under this arrangement, Vogel previously would "advance" poker tournament entry fees to Catala. Thereafter, if Catala succeeded in winning, he would return the entry fee to Vogel and the profit would be divided between the parties in accordance with a pre-arranged percentage. Catala stated that although he did not always win, usually their arrangement was "in the positive."
Catala further testified that he spoke to Vogel on the telephone every day while he was in Las Vegas; however, he admitted on cross examination that there were no records of these calls. He stated that he won $18,000 during the Las Vegas trip, but that the winnings were solely from playing "cash games," so-called, and that he did not win anything from playing poker tournaments. Catala also stated that his business *Page 4 
arrangement with Vogel continued after his return from Las Vegas, but he said that the relationship soured when Vogel realized that Catala was unwilling repay the $8500. Catala then testified that the parties' business arrangement temporarily resumed after Vogel agreed to drop his lawsuit against Catala; however, that the arrangement did not last.
There was testimony from two other gamblers with whom Vogel had arrangements similar to the arrangement testified to by Catala. Although one of the witnesses believed that Vogel and Catala had some sort of business arrangement, neither of the two witnesses had any direct knowledge of the terms or conditions under which Vogel advanced the $8500 to Catala on April 9, 2007.
 B. Findings of Fact
After considering the credibility of the witnesses, the Court makes the following findings of fact:
1. Vogel and Catala are both residents of Rhode Island.
2. In early 2007, Catala traveled to Las Vegas, Nevada, for a previously planned trip with his fiancée. During the trip he purchased a diamond ring for his fiancée.
3. On or about April 9, 2007, Catala placed a telephone call to Vogel. At the time, Catala was in Nevada and Vogel was in Rhode Island.
4. During the telephone call, Vogel agreed to loan $8500 to Catala in consideration of Catala's agreement to repay that sum upon his return to Rhode Island.
5. Vogel did not knowingly lend the $8500 to Catala for the purpose of Catala's gambling. *Page 5 
6. Previously, Vogel did advance money to facilitate Catala's entry into tournament poker games. On those occasions, it was agreed that the advance for entry fees would not be repaid by Catala unless Catala won money in the poker tournament. The Court does not find that the $8500 advance to Catala was in furtherance of the above poker arrangements; instead, the $8500 was a loan made by Vogel to Catala, and for which Catala was obligated to repay regardless of how he used the money.
7. At the time of the loan, Vogel did not knowingly lend $8500 to Catala for the purpose of Catala's betting or engaging in games of chance.
8. After he returned to Rhode Island from Las Vegas, Catala did not repay the $8500 that Vogel previously had loaned him.
9. The amount of the outstanding indebtedness at the time of trial was $8500. Catala never has repaid Vogel any portion of the loan, and is obligated by oral contract to repay Vogel $8500.
 II Standard of Review
In a non-jury trial, "the trial justice sits as a trier of fact as well as law." Hood v. Hawkins, 478 A.2d 181, 184 (R.I. 1984). "Consequently, he [or she] weighs and considers the evidence, passes upon the credibility of the witnesses, and draws proper inferences." Id. "The task of determining the credibility of witnesses is peculiarly the function of the trial justice when sitting without a jury." Walton v. Baird, 433 A.2d 963, 964 (R.I. 1981). "It is also the province of the trial justice to draw inferences from the testimony of witnesses. . . ." Id.; see alsoRodrigues v. Santos, 466 A.2d 306, 312 (R.I. 1983) *Page 6 
(stating that it is for the trier of fact to determine the question as to who should be believed).
The reason that a trial justice's factual determinations and credibility assessments traditionally are given such respect is because it is "the judicial officer who actually observes the human drama that is part and parcel of every trial and who has had the opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record." In the Matter of the Dissolution of Anderson,Zangari Bossian, 888 A.2d 973, 975 (R.I. 2006). Accordingly, "as a front-row spectator the trial justice has the chance to observe the witnesses as they testify and is therefore in a `better position to weigh the evidence and to pass upon the credibility of the witnesses. . . .'" Perry v. Garey,799 A.2d 1018, 1022 (R.I. 2002) (quoting Nisenzon v.Sadowski, 689 A.2d 1037, 1042 (R.I. 1997)).
 III Analysis A. Choice of Law
It is undisputed that money changed hands from Plaintiff to Defendant after an oral agreement was reached. Vogel asserts that the exchange constituted a loan for which he expected repayment, and for which Catala agreed to repay. He maintains that Catala's failure to repay the loan constitutes a breach of contract. Catala contends that the monetary exchange was in furtherance of a business arrangement relating to the payment of entry fees for poker tournaments. Before the Court rules on this issue, first it is necessary to determine the choice of law that should be applied to this contract dispute. *Page 7 
"[O]rdinarily the validity of a contract depends upon the law of the place where it is made." Owens v. Hagenbeck-Wallace ShowsCo., 58 R.I. 162, 192 A. 158, 163 (1937). Accordingly,
 "It is a fundamental principle of conflict of laws that contracts are to be governed by the laws of the state or country in which they are made, unless made with a view to performance in another state or country, in which case they will be governed by the law of such state or country. This principle is as applicable to contracts of interstate or international carriage as to any other type of contract." Matarese v. Calise, 111 R.I. 551, 653, n. 4, 305 A.2d 112, n. 4 (1973).
Furthermore, in situations where there is no contractual stipulation concerning the controlling law, "Rhode Island's conflict-of-laws doctrine provides that the law of the state where the contract was executed governs." DeCesare v. Lincoln BenefitLife Co., 852 A.2D 474, 583-84 (R.I. 2004). "Acceptance of the offer, or `the final act which constitute[s] the making of the contract,' determines the state of completion." Id.
(Internal citations omitted). Finally, "[a] contract, however, may be valid by the law of the place of its making or of its performance and yet fail practically, if it is contrary to the public policy of the law of the forum." Owens,58 R.I. 162, 192 A. at 163.
In the instant matter, there was no contractual stipulation concerning the controlling law. However, applying the fore-mentioned principles to the facts of this case, the Court believes that the substantive law of Rhode Island should apply to any questions of contract formation or enforcement, since the final act in the alleged contract formation was Vogel's advance from his Rhode Island bank account to Catala at the Bellagio Hotel. The wire transfer of cash manifested Vogel's acceptance of the terms of the contract. Furthermore, by instructing his bank to make the transfer to Catala, Vogel *Page 8 
relied upon Catala's promise to repay upon his return to Rhode Island. Accordingly, Vogel's advancement of the money constituted the final act with respect to the parties' formation of a contract.[1] Consequently, the Court concludes that Rhode Island law governs the enforcement of that transaction.
 B. Application of Rhode Island Law
In Rhode Island, there is a statutory prohibition against the enforcement of gambling contracts. Catala maintains that this prohibition precludes Vogel from recovery because the parties' alleged business arrangement should be deemed "utterly void" and thus unenforceable under G.L. 1956 § 11-19-17. Vogel counters that the monetary exchange constituted a conventional loan and, therefore, is not governed by the statute.
Section 11-19-17 of the Rhode Island General Laws provides in pertinent part:
 "All . . . promises, given or made for money, lands, houses, or other property, or article or piece of property, real, personal, or mixed, won at any game, or by betting at any race or fight, or for the repayment of money knowingly lent for such gaming or betting, shall be utterly void." Section 11-19-17.
Resolution of the enforceability of the monetary transaction between the parties requires the Court to make factual determinations and credibility assessments. See In theMatter of the Dissolution of Anderson, Zangari Bossian,888 A.2d at 975; supra, Findings of Fact. These findings may be brief "as long as they address and resolve the *Page 9 
controlling factual and legal issues." White v. Le Clerc,468 A.2d 289, 290 (R.I. 1983); Super. R. Civ. P. 52(a).
According to Catala, Vogel agreed to advance the $8500 for payment of entry fees to a poker tournament, and that Catala only would be obligated to repay the advance if Catala had won the tournament. The parties then would split the winnings or profit. The Court finds this testimony to be lacking in credibility and corroboration with respect to the terms of the alleged advance by Vogel for payment of an entry fee to a poker tournament. Furthermore, Catala did not produce any evidence to support his contention that he participated in poker tournaments during his Las Vegas trip.
Conversely, this Court finds more credible the testimony of Vogel. Consequently, the Court finds that the monetary transaction between the parties constituted a loan not tied to the gambling fortunes of Catala, and for which Vogel expected repayment upon Catala's return from Nevada. As to Vogel's alleged knowledge of Catala's intended use of the $8500 for gambling purposes, the Court finds no credible evidence to support a finding that there were any promises given or made for the repayment of money knowingly lent for gambling or betting in violation of § 11-19-17. Furthermore, the Court finds credible that Vogel believed his friend sounded desperate during the April 9th telephone call because Catala ran short of cash due to the extension of his trip and the purchase of the diamond ring for his fiancée. Accordingly, the Court finds that Vogel did not knowingly advance the money to Catala for the purpose of gambling or betting.
Based on the findings above, the Court cannot conclude that Vogel knowingly lent money to Catala for the purpose of gaming or betting. Furthermore, absent credible evidence to the contrary, the Court concludes that Vogel extended, and Catala received, a *Page 10 
loan for $8500 that was to be repaid upon Catala's return to Rhode Island. To conclude otherwise would permit Catala to avoid repaying this loan, thus resulting in his unjust enrichment. SeeMerchants Mutual Insurance Company v. Newport Hospital,108 R.I. 86, 93, 272 A.2d 329, 332 (1971). ("Unjust enrichment permits the recovery in certain instances where a person has received from another a benefit, the retention of which, would be unjust under some legal principle, a situation which equity has established or recognized.") The Court further concludes that Catala never made, and Vogel never received, repayment of the loan.
 IV Conclusion
In light of the foregoing, the Court concludes that Catala owes Vogel the sum of $8500 representing the balance due on the oral contract to make and repay a loan. Judgment shall enter for Vogel in that amount, together with costs and statutory interest running from April 9, 2007, to the date of the judgment.
Counsel shall submit an appropriate form of judgment for entry.
[1] Even if receipt of the cash advance in Nevada could be construed as the final act determining completion of the contract, as Catala posits, considering that Rhode Island has a statutory prohibition against the enforcement of gambling contracts (see G.L. 1956 § 11-19-17), the contract would fail practically as contrary to Rhode Island public policy. SeeOwens, 58 R.I. 162, 192 A. at 163. Furthermore, while a center of gravity approach may not be appropriate in choosing the applicable law in a contract case, the fact that the contract was formed in Rhode Island, both parties are Rhode Island residents, and the relationship of the parties shows greater contacts with this state rather than any other, lends further support to a conclusion that Rhode Island substantive law should apply. *Page 1