Deborah HOLDEN

v.

Guido R. SALVADORE.

No. 2008–69–Appeal.

Supreme Court of Rhode Island.

Feb. 5, 2009.

Paul R. Crowell, Esq., Providence, for Plaintiff.

Dennis Baluch, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

In light of the current foreclosure crisis in this state and across the country, we are not surprised that we must consider an appeal presented by a homeowner faced with very difficult financial circumstances whose home was threatened by foreclosure proceedings. We do so with empathy for those who have found themselves in that unhappy position. This case came before the Supreme Court on December 9, 2008, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After hearing the arguments of counsel and reviewing the memoranda of the parties, we are satisfied that cause has not been shown. Accordingly, we shall decide the appeal at this time. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

The plaintiff, Deborah Holden, appeals from a Superior Court judgment denying her request for equitable relief against the defendant, Guido R. Salvadore. Holden, in an attempt to save her home from foreclosure by a lending institution, made a bid at the foreclosure sale. She was the success-

ful bidder at $265,000, and she made a deposit of $5,000; but, she had only thirty days to pay the remaining $260,000 to complete the transaction. With about two weeks left before the deadline, and after failing to obtain financing despite significant efforts, Holden contacted Guido Salvadore, an attorney who had helped her three years earlier with a problem involving the Human Rights Commission. In that matter, Salvadore had made some phone calls on Holden's behalf, and he never charged her for his assistance. Because of this, Holden believed Salvadore was a compassionate man, and she called him seeking his assistance.

Holden informed Salvadore about her financial plight, and she told him that she thought her property had a value of $379,000. She also told him that she was trying to sell the property and that she already had a realtor who had listed it for sale on her behalf. Salvadore told her he might consider buying the property and then give her a chance to repurchase it. After he reviewed the foreclosure documents, he decided to enter into such an agreement with Holden.

That agreement provided that Holden would assign Salvadore her rights under the memorandum of terms and conditions of sale that she had entered into with the mortgagee. It is significant that the agreement did not provide for any payment between the parties in exchange for the assignment. Rather, Salvadore granted Holden a ninety-day option to buy the property from him for $310,000. In the alternative, if Holden successfully found a third-party buyer for the property, Holden would be entitled to any profit from the sale that exceeded $310,000. It is also significant that Holden retained her own attorney, and the parties negotiated, drafted, and executed a written accord. Salvadore obtained a loan, with interest, paid the mortgagee the $260,000 that it was due under the agreement with Holden, and the title to the property was conveyed to him.

After taking title to the property, Salvadore permitted Holden to live in the property free of rent. Holden also collected rent from tenants in the building.[1] She continued to market the property for sale, and eventually the realtor produced a buyer who made a deposit to purchase the property for $350,000. However, Holden did not accept the offer; instead, she tried to secure financing so that she could exercise the option under her agreement with Salvadore to buy the property herself. Salvadore testified that when he learned of Holden's decision not to sell the property, he advised her against this course of action. But, she was determined to keep the property; she retained a new attorney and informed Salvadore that she was exercising her option to buy the property from him. She also requested an extension of the closing date for a few more days and asked Salvadore to reduce the purchase price to $300,000. Salvadore testified that he agreed to both of these modifications to the agreement.[2] Thereafter, Salvadore received no further communication from Holden or her attorney until Holden initiated litigation.

Holden filed a verified complaint in which she alleged usury (count 1) and fraud and misrepresentation (count 2), and

---

1. It is not clear from the testimony provided or from the trial justice's findings, whether under the agreement, Holden was required to turn over the collected rents to Salvadore, or whether in fact she did.

2. Holden gave contrary testimony, and disputed the assertion that Salvadore agreed to reduce the purchase price to $300,000. The trial justice, however, accepted Salvadore's testimony and concluded that Salvadore did, in fact, reduce the purchase price.

she requested relief in the form of both monetary damages and a preliminary and permanent injunction. Holden later amended her complaint to include additional counts, alleging that the defendant violated the Mortgage Foreclosure Consultant Regulation Act, G.L.1956 chapter 79 of title 5, and the Deceptive Trade Practices Act, G.L.1956 chapter 13.1 of title 6 (count 3). She also included a count requesting declaratory judgment under the Uniform Declaratory Judgments Act, G.L. 1956 chapter 30 of title 9 (count 4), and added a claim for relief in the form of a constructive trust.

Holden also filed a motion for a temporary restraining order and a preliminary injunction to preclude Salvadore from evicting tenants, transferring title, or otherwise alienating or encumbering the property, located at 10–12 Mill Street in the Town of Warren. The request for a temporary restraining order was denied by a justice of the Superior Court.[3] The parties subsequently appeared before a trial justice for a hearing on Holden's motion for a preliminary injunction. After hearing testimony, and over Holden's objection, the trial justice consolidated Holden's request for a preliminary and permanent injunction pursuant to Rule 65 of the Superior Court Rules of Civil Procedure.

Holden testified that she contacted Salvadore, as well as some other people, in an effort to obtain financing to enable her to buy her property at the foreclosure sale.[4] She said that when she spoke to Salvadore, he told her that he would be involved only if he obtained title to the property. She testified that she did not accept the $350,000 offer procured by the real estate broker because she wished to exercise the option to purchase the property herself. She said that she was interested in retaining the property because she needed a roof over her head and she felt that this was her home.[5] In her testimony, she conceded that she filed a petition for bankruptcy in September 2006, but that her bankruptcy petition did not list Salvadore as a creditor, nor did it claim any ownership interest in the property as an asset of her estate.

Salvadore testified that after he spoke to Holden, he realized that they each might have the opportunity to profit from the transaction and so he entered into the agreement with her, which he saw as a business opportunity. Salvadore said that he learned that Holden had filed for bankruptcy in September 2006 and that the petition listed neither Salvadore as a creditor nor the property as an asset.

At the close of the evidence, the trial justice rendered a bench decision in which he determined that Holden had failed to present a prima facie case and that she had failed to meet the burden necessary for a grant of equitable relief. Significantly, the trial justice concluded that the transaction was not a loan. He found that Salvadore viewed the arrangement as a business opportunity, and he also found

3. The Superior Court, however, ordered that defendant provide plaintiff with notice of any future offers to purchase the property or matters involving the transfer of title or creation of an encumbrance on the property. The Superior Court also ordered defendant to give plaintiff thirty days notice of any real estate closing involving the property and to place all rents attributable to the property in an escrow account.

4. Holden did not provide this Court with a copy of the transcript of her testimony. As a result we are unable to review the facts concerning Holden's testimony as recited by the trial justice.

5. She testified that she had been living in the property only since June 2006 and that she had owned another property that had been subject to foreclosure.

that Holden was making a business decision when she entered into the agreement with Salvadore. The trial justice found that both Salvadore and Holden reasonably expected to make a profit. Salvadore credited Holden's estimation of the property's value at $379,000, and he therefore expected that he would engender a profit of about $50,000 and that Holden also expected to profit to the extent of about $50,000 to $60,000. The trial justice was also strongly persuaded by the fact that Holden was represented by independent counsel and also that Holden acknowledged in the agreement that Salvadore had advised her to retain counsel of her own. The trial justice also considered it important that the agreement was in writing and executed by the parties, that it contained provisions that the agreement was a "joint effort," and that it professed to be the entire agreement between the parties. The trial justice concluded that in making the agreement, Salvadore did not enjoy a distinct advantage over Holden. The court also found it material that in September 2006, with the assistance of an attorney, Holden filed for bankruptcy protection but that she did not list the transaction between herself and Salvadore as a loan, nor did she claim an interest in the property as an asset of her estate. This, to the trial justice, constituted compelling evidence that the transaction was not a loan. The court also reasoned that this demonstrated that Holden did not believe that she owned the property any longer. The court further found it significant that Holden had passed on what appeared to be a concrete opportunity to sell the property.

With respect to Holden's claim that Salvadore's activities came within the ambit of the Mortgage Foreclosure Consultant Regulation Act, the court concluded that Salvadore was not a mortgage foreclosure consultant. The trial justice found that Holden did not consult Salvadore, Salvadore was not her lawyer, and he was not hired by her. Rather, the court found that "[s]he came to him because she was desperate, and he took on the situation and said I'll agree under the following terms." The court found that the contract between the parties was an arms-length transaction and not a consultation, and therefore, the court concluded that the Mortgage Foreclosure Consultant Regulation Act did not apply. The court further determined that there was no violation of a fiduciary duty or any evidence of fraud, overreaching, or breach of trust that would justify the court imposing a constructive trust on the property.

As a result, on February 23, 2007, the Superior Court issued an order denying Holden's request for a preliminary and permanent injunction as well as the other equitable relief that she had sought. An order granting entry of partial final judgment pursuant to Rule 54(b) of the Superior Court Rules of Civil Procedure was entered in favor of Salvadore on March 26, 2007. Holden timely appealed.[6] On appeal, Holden argues to this Court that the trial justice erred when he concluded that the transaction was not a loan and when he concluded that Salvadore was not a mortgage foreclosure consultant. After a thorough review of the record, we fail to see merit in these arguments.

## Standard of Review

When reviewing the grant or denial of a permanent injunction, we will reverse the lower court on appeal only

---

**6.** Holden filed a notice of appeal on April 13, 2007. Partial final judgment was entered on February 6, 2008. Although plaintiff's appeal was premature, it is nevertheless valid because judgment pursuant to Rule 54(b) of the Superior Court Rules of Civil Procedure actually was entered. *See State v. Hesford*, 900 A.2d 1194, 1197 n. 3 (R.I.2006).

"when it can be shown that the trial justice misapplied the law, misconceived or overlooked material evidence or made factual findings that were clearly wrong." *Renaissance Development Corp. v. Universal Properties Group, Inc.*, 821 A.2d 233, 236 (R.I.2003) (quoting *Town of West Greenwich v. A. Cardi Realty Associates*, 786 A.2d 354, 357–58 (R.I.2001)). This Court defers to the trial justice's findings of fact and affords them significant weight. *Ondis v. City of Woonsocket*, 934 A.2d 799, 802 (R.I.2007). On the other hand, we review questions of law and statutory interpretation *de novo*. *Richards v. Halder*, 853 A.2d 1206, 1209 (R.I.2004).

### Was this transaction a loan in disguise?

 Holden maintains that the trial justice should have found that her transfer of title to defendant, coupled with her option to repurchase the property, was a loan and therefore subject to and in violation of the Rhode Island usury laws. *See* G.L. 1956 § 6–26–2. When determining whether a transaction is a loan or other business transaction, we focus on the substance over the form of the transaction and examine all the facts and circumstances that reveal the true nature of the transaction. *See Lancia v. Grossman's of Rhode Island, Inc.*, 100 R.I. 407, 411–12, 216 A.2d 517, 520 (1966) (holding extension of time to pay debt in exchange for note and mortgage was a business transaction rather than a loan); *Nazarian v. Lincoln Finance Corp.*, 77 R.I. 497, 503, 78 A.2d 7, 9 (1951) (upholding trial justice's factual determination that transaction was a loan rather than a conditional sale); *Daniels v. Mowry*, 1 R.I. 151, 164 (1842) ("It is the intent of parties that taints a contract with

usury, and not the mere words in which that contract is expressed."). Ultimately, the existence of a loan is a question of fact. *West Pico Furniture Co. of Los Angeles v. Pacific Finance Loans*, 2 Cal.3d 594, 86 Cal.Rptr. 793, 469 P.2d 665, 671 (1970) ("Whether a particular transaction is a usurious loan or a sale is a question of fact."). The factual inquiry pertains to "whether the parties intended to create a debtor-creditor relationship." *Kjar v. Brimley*, 27 Utah 2d 411, 497 P.2d 23, 26 (1972); *see also Koch v. Wasson*, 161 N.W.2d 173, 177 (Iowa 1968) (concluding transaction to be a loan when parties treated transaction as giving rise to a debtor-creditor relationship).

 In the present case, the trial justice made factual findings that the parties intended to enter into a business transaction for profit, and did not intend their dealings to be a loan. It is well settled that this Court will overturn a trial justice's findings of fact only when they are clearly wrong or when the trial justice overlooked or misconceived material evidence. *Board of Governors for Higher Education v. Infinity Construction Services, Inc.*, 795 A.2d 1127, 1129 (R.I.2002) (citing *Retirement Board of the Employees' Retirement System of Providence v. City Council of Providence*, 660 A.2d 721, 724 (R.I.1995)). Unfortunately, our burden here is made a bit heavier because Holden has not provided us with a transcript of her own testimony. The decision to pursue an appeal without ordering the full transcript of the Superior Court proceeding is "risky business." *731 Airport Associates, LP v. H & M Realty Associates, LLC*, 799 A.2d 279, 282 (R.I.2002).[7]

---

7. Holden's failure to provide a transcript would ordinarily preclude review by this court, *see State v. Jennings*, 117 R.I. 291, 293–94, 366 A.2d 543, 544–45 (1976); however, in

her Superior Court Rule 12A statement, she submits that the Superior Court erred despite its findings of fact, and thus, she appears to accept the trial justice's findings of fact.

After careful review of the record provided, it is our opinion that the trial justice was not clearly wrong when he decided the transaction was not a loan. He gave reasons for his findings. He found that the parties did not intend a loan because Salvadore considered the arrangement to be a business deal, he did not lend her any money, and Holden did not believe that she retained any interest in the property or owe any debt to Salvadore. Further, Holden had the potential to realize a profit of about $50,000 to $60,000, the agreement was signed by both parties, Holden was represented by counsel,[8] and the agreement specified that it was a "joint effort" representing the entire agreement between the parties. The trial justice also considered it a salient fact that Holden filed for bankruptcy protection, but that she did not list the transaction as a loan or list an interest in the property as an asset of her estate. These facts plainly support the trial justice's conclusion that the parties did not intend to or believe that they entered into a loan agreement.

To support her argument, however, Holden, relies on a number of cases in which courts have considered the question of whether a sale subject to an option to repurchase is in substance a usurious loan. In these cases, the intention of the parties at the time of the transaction guides the various courts' determinations as to whether the transaction was a loan or a sale with an option to repurchase. *See, e.g., Kawauchi v. Tabata,* 49 Haw. 160, 413 P.2d 221, 227–28 (1966) (holding trial court erred when it found that transaction intended by parties was a sale and option to repurchase rather than a loan); *Robinson v. Durston,* 83 Nev. 337, 432 P.2d 75, 76 (1967) (upholding trial court's determination that sale with option to repurchase was truly a loan in disguise); *Cannon v. Seattle Title Trust Co.,* 142 Wash. 213, 252 P. 699, 701 (1927) (holding whether transaction was a usurious loan or sale with option to repurchase was a question of fact for the jury). The common thread in these cases, the absence of which distinguishes them from the case at bar, is the existence of a debtor-creditor relationship between the holder of title and the holder of the option. *See Robinson,* 432 P.2d at 83–84 (holding transaction had all indicia of loan in which property was conveyed as security); *Cannon,* 252 P. at 701 (reciting the proposition that the real inquiry is "whether there had been a borrowing and lending at a greater

Therefore, to the extent that Holden argues that the trial justice misconceived the law that applies to these facts, and such errors clearly appear in the portion of the record provided, her failure to file a transcript does not deprive her of review. *See DePetrillo v. Coffey,* 118 R.I. 519, 521 n. 1, 376 A.2d 317, 318 (1977).

8. Holden asserts that the trial justice was clearly wrong when he relied on the fact that Holden was represented by counsel because he assumed the attorney was competent without evidentiary support. This argument, however, puts the cart before the horse. It would be Holden's burden to demonstrate that her legal counsel was incompetent. Holden has not provided us with any evidence that would support such an assertion. Holden asserts, in a parenthetical, buried in the middle of her brief, that she was not able to discover facts to support a claim that her attorney was incompetent because the trial justice denied her the right to conduct additional discovery. She further states that the trial justice improperly merged her requests for preliminary and permanent injunctive relief at the conclusion of the hearing. These parenthetical claims were not supported by any citation to law, and they were not discussed any further in the brief or at oral argument. "Simply stating an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue." *Wilkinson v. State Crime Laboratory Commission,* 788 A.2d 1129, 1131 n. 1 (R.I.2002).

rate of interest than the law allows"). The debtor-creditor relationship may be in the form of personal liability of the debtor to pay a sum of money to the creditor. *See Kawauchi*, 413 P.2d at 228–29 (examining cases where personal liability is essential element of a mortgage). Alternatively, in some jurisdictions, it may also be in the form of "a large margin between the debt or sum advanced and the value of the land conveyed." *See id.* at 230 (quoting *Campbell v. Dearborn*, 109 Mass. 130, 144 (1872)).

In *Kawauchi*, 413 P.2d at 223, the plaintiff brought an action seeking to declare a transaction to be a mortgage securing a usurious loan. To avoid a foreclosure sale, the plaintiff deeded property valued at $160,000 to the defendant in exchange for $90,000 to pay off the mortgage plus a lease and option to repurchase the property for $117,000. *Id.* at 224, 225–26. The court held the transaction to be, in substance, a loan because the sum that the defendant paid for the property was inadequate in relation to the value of the property. *Id.* at 230–31. "In other words, the law may imply a promise to repay a debt under particular circumstances of any case, where it is clear that the lender relies on the property for his security being satisfied that he is protected by its high value in relation to amount loaned." *Robinson*, 432 P.2d at 83.

When we examine the substance of the transaction between Holden and Salvadore, it is clear that the parties did not intend to enter into a debtor and creditor relationship. Holden was not personally indebted to Salvadore for any amount of money and Salvadore obtained no right to

compel Holden to pay him any sum of money whatsoever. Furthermore, unlike the cases cited above, the putative debtor did not own or transfer any deed to property to the putative lender. Here, Holden already had lost her home to foreclosure. She did not deed the property to Salvadore; rather, he purchased the property from the mortgagee. It is most significant that Holden, unlike the plaintiff in *Kawauchi*, did not relinquish title to her property in exchange for the use of a sum of money that was significantly less than the property's value. All Holden relinquished to Salvadore was her right, as the highest bidder, to purchase the property and take the title in her own name. In exchange, Holden secured the option to buy the property from Salvadore, or in the alternative, an opportunity to make a profit from a third-party sale. In the circumstances presented to us, we see no evidence of an actual debt or a transfer of property for inadequate consideration that would have served as security for a debt. Therefore, we are confident in holding that the trial justice was not clearly wrong when he concluded that the transaction between these parties was not a loan.

### Was Salvadore a mortgage foreclosure consultant?

 Holden argues that the trial justice made an erroneous ruling when he concluded that Salvadore was not a "mortgage foreclosure consultant" who was subject to the prohibitions set forth under § 5–79–4.[9] To summarize, the statute defines a mortgage foreclosure consultant as a person who, for compensation, renders services to carry out one or more of eight delineated functions.[10] Holden alleges that

---

9. General Laws 1956 § 5–79–4(a)(5) provides that a mortgage foreclosure consultant may not "[a]cquire any interest, directly, or indirectly, or by means of a subsidiary or affiliate in a residence in foreclosure from an owner

with whom the foreclosure consultant has contracted."

10. Section 5–79–1(a) defines a "foreclosure consultant" in full as:

Salvadore was a mortgage foreclosure consultant because he performed a service that would either "[s]top or postpone the foreclosure sale" or "[s]ave the owner's residence from foreclosure." Section 5–79–1(a)(1), (8). We do not agree.

The record reveals that Salvadore never made a solicitation, representation, or offer to help Holden stop or postpone the foreclosure sale or save her residence from foreclosure. Rather, Salvadore represented that he would step into the shoes of the purchaser and become the grantee/purchaser at the closing. Indeed, the agreement between the parties stated that, "assignor previously owned the premises * * *, which premises were sold at a foreclosure sale held on or about July 6, 2002." In fact, by the time Holden contacted Salvadore, the sale and foreclosure already had taken place, Holden was the highest bidder, and she and the auctioneer had signed the appropriate documents. *See Outpost Cafe, Inc. v. Fairhaven Savings Bank,* 3 Mass.App.Ct. 1, 322 N.E.2d 183, 184, 187 (1975) (holding under Massachusetts law, a sale at foreclosure occurs when the highest bid is accepted and the memorandum of sale is executed with the purchaser); *see also 140 Reservoir Avenue Associates v. Sepe Investments, LLC,* 941 A.2d 805, 812 (R.I.2007) ("[T]he mortgagor has an opportunity to redeem down to the time of the [mortgage foreclosure] sale * * *, but this opportunity comes to an end with such sale * * *.") (quoting 4 Richard R. Powell, *Powell on Real Property,* § 37.46 at 37–317 (2007)). Therefore, we can draw no conclusion other than that Salvadore did not make any representation to Holden that he would stop or postpone the foreclosure sale or save her residence from foreclosure. Consequently, there is nothing in the record that would justify a holding that Salvadore was a mortgage foreclosure consultant as that term is defined in the statute.

### Conclusion

The judgment of the Superior Court is affirmed. The record in this case shall be returned to that tribunal.

"any person who, directly or indirectly, makes any solicitation, representation, or offer to any owner to perform for compensation or who, for compensation, performs any service which the person in any manner represents will in any manner do any of the following:

"(1) Stop or postpone the foreclosure sale;

"(2) Obtain any forbearance from any beneficiary or mortgagee;

"(3) Assist the owner to exercise the right of redemption provided in § 34–23–2;

"(4) Obtain any extension of the period within which the owner may reinstate the owner's obligation;

"(5) Obtain any waiver of an acceleration clause contained in any promissory note or contract secured by a mortgage on a residence in foreclosure or contained in the mortgage;

"(6) Assist the owner in foreclosure or loan default to obtain a loan or advance of funds;

"(7) Avoid or ameliorate the impairment of the owner's credit resulting from the recording of a notice of default or the conduct of a foreclosure sale; or

"(8) Save the owner's residence from foreclosure."