### Philip PELLETIER et al.

v.

### Aphrodite LAUREANNO.

### No. 2010–203–APPEAL.

Supreme Court of Rhode Island.

June 27, 2012.

Lauren E. Jones, Esq., Providence, for plaintiffs.

Justin T. Shay, Esq., Providence, for defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice INDEGLIA, for the Court.

It appears that good fences do not always make good neighbors,[1] as demon-

---

1. We reference the poetic verse, "[g]ood fences make good neighbours[,]" penned by the well-known poet, Robert Frost. *See* "Mending Wall," *North of Boston* (1914), quoted in The Oxford Dictionary of Modern Quotations 86 (Tony Augarde ed. 1991).

strated in the case before this Court. In this appeal, the plaintiffs, Philip and Eileen Pelletier (the Pelletiers), challenge a Superior Court judgment in favor of their neighbor, Aphrodite Laureanno (Laureanno), dismissing the Pelletiers' complaint for injunctive relief and monetary damages. The Pelletiers believed that a written and recorded agreement, entered into by the Pelletiers and Laureanno's predecessor-in-interest, created a permanent easement for parking on a small portion of Laureanno's adjacent property. Laureanno disagreed, and expressed her dissonance in the form of a fence, which served to obstruct the Pelletiers' long-standing parking practice. After a trial on the merits, the trial justice concluded that the written agreement at issue did not grant an easement to the Pelletiers, but instead served merely as a revocable license. On appeal, the Pelletiers ask that we deem this determination to be erroneous.

This case came before the Supreme Court for oral argument on January 24, 2012, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After reviewing the record and considering the written and oral submissions of the parties, we are satisfied that this appeal may be resolved without further briefing or argument. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

This controversy involves two small adjacent parcels of property in the Town of Tiverton, Rhode Island, and situated along the Sakonnet River. The Pelletiers currently own the parcel located at 1771 Main Road and specified as Block 73, Card 4 in the town's tax assessor's records (lot 4),[2] having purchased the property in 1989.[3] Laureanno holds title to the property at 1767 Main Road, further identified in the tax assessor's records as Block 73, Card 5 (lot 5). Laureanno acquired lot 5 from Paul E. Farris by virtue of a warranty deed dated December 23, 1997, and recorded on December 24, 1997 (the Laureanno deed). Mr. Farris and his wife, Dorislee (the Farrises), originally acquired lot 5 from Susan Roderick (Roderick) and J. Henry Negus (Negus) in 1981 by way of a warranty deed recorded in the town's land evidence records (the Farris deed). Through the Farris Deed, Roderick and Negus also conveyed a strip of land formerly of lot 4 to increase the size of lot 5 and simultaneously established an easement permitting the owners of lot 4 to pass over the strip conveyed to lot 5.[4] In

---

**2.** Although the parcels at issue are referred to in the record as "cards," for practical purposes we shall refer to the subject parcels as "lots."

**3.** We note that although the trial justice found that the Pelletiers acquired lot 4 from Susan Roderick and J. Henry Negus, which sentiment is likewise alleged in the Pelletiers' complaint, the record reveals that the Pelletiers actually acquired lot 4 from Manuel Laureanno, the defendant's ex-husband, and Philip E. Pelletier, the father of plaintiff Philip J. Pelletier. Specifically, Eileen Pelletier testified at trial that she and her husband "purchased the land from [her] father-in-law Phil Pelletier

and the Laureannos." Additionally, the driveway agreement at issue, discussed *infra,* references the "deed of Manuel Laureanno to Philip J. Pelletier and Eileen G. Pelletier dated July 26, 1989 and further, [the] deed of Philip E. Pelletier to Philip J. Pelletier and Eileen G. Pelletier dated July 28, 1989[,]" in regard to the Pelletiers' ownership of lot 4. However, we are rendered debilitated in our confirmative abilities as these 1989 deeds are absent from the record.

**4.** Although not reflected in the record, we assume for the purposes of this opinion that at one point prior to the execution of the

conjunction with this 1981 transfer, Roderick, Negus, and the Farrises entered into a separate agreement that granted to the Farrises "and their heirs, successors and assigns, a permanent easement across [lot 4] for vehicle and foot access for the purpose of constructing, maintaining, repairing or replacing the septic system and the sea wall on [lot 5]" (the maintenance easement).[5]

On November 8, 1989, the Pelletiers, who purchased lot 4, and the Farrises, who then owned lot 5, entered into an agreement, titled "AGREEMENT," in which the Farrises permitted the Pelletiers "to construct and erect a driveway on the northeasterly portion of the premises" without objection by the Farrises. The parties "MUTUALLY AGREED" that "Philip J. Pelletier and Eileen G. Pelletier may construct and maintain a driveway Ten (10') feet in width and Twenty (20') feet in length at the said northeasterly corner of the * * * premises" (the driveway agreement). The parties to the driveway agreement also stipulated that the Pelletiers "shall plant shrubs along the perimeter of the area and [that] they shall further maintain [the shrubs] to a height of about Twenty–Four (24″) inches to Thirty-[T]wo (32″) inches." The parties further agreed that the Pelletiers had "the right to plant grass in the driveway area" and "the right of putting a blue stone parking area or patio blocks at said driveway." Pursuant to the driveway agreement, the Pelletiers were allowed to park one motor vehicle in the driveway. The Pelletiers, on the other hand, agreed "to allow [the Farrises] the right of full access

upon said driveway for all types of maintenance of [lot 5] * * * or the ability to go upon said driveway for the purpose of repairing a holding tank located on [lot 5] * * *." Lastly, the parties acknowledged that the driveway agreement was "subject to certain rights and obligations referred to in [the maintenance easement] * * *." The parties recorded the driveway agreement in the town's land evidence records.

Thereafter, the Pelletiers constructed a bluestone gravel driveway and planted shrubbery around the perimeter of the area as required under the driveway agreement. The driveway itself was situated primarily on the Pelletiers' property, lot 4, with a smaller portion occupying a wedge in the "front" corner of lot 5 along Main Road. The Pelletiers used the driveway and maintained the shrubs for approximately twenty years.[6]

As noted, Laureanno purchased lot 5 from the Farrises in December 1997. Although the warranty deed executed in regard to Laureanno's purchase made explicit reference to the maintenance easement and the rights and covenants of the parties therein, the Laureanno deed did not make note of the driveway agreement entered into by the Pelletiers and the Farrises. At some point subsequent to her purchase, Laureanno became aware of the written, recorded driveway agreement while "doing a search for an assessment on [lot 5]." In June 2007, almost ten years after her acquisition of lot 5, Laureanno sent the Pelletiers a letter, through an attorney, concerning the Pelletiers' previously filed dock-expansion application then pending with the Coastal Resources Management

---

Farris Deed, Roderick and Negus owned both lot 4 and lot 5.

**5.** We note that the maintenance easement, referenced herein for contextual purposes, is separate and distinct from the driveway agreement at issue in this appeal.

**6.** The record reflects that the Pelletiers resided on lot 4 for thirteen years, but eventually rented the house to tenants.

Council. In this letter, Laureanno conditioned her support of the Pelletiers' application on several requests, one of which sought the Pelletiers' "acknowledgment that [the] driveway and shrubbery are partially located on the southerly border of [lot 5]" and that "such use of this area is permissive only * * *." The letter further required that the Pelletiers "remove any and all improvements from the affected area" upon sixty-day written notice from Laureanno.[7] The Pelletiers did not respond to this letter.

Two years later, Laureanno installed a fence along the property line of lot 4 and lot 5, consequently partitioning the driveway area constructed by the Pelletiers. According to the Pelletiers, the fence effectively rendered the driveway useless, because it prevented the parking of a car on the portion remaining on their property. As a result of the newly erected encumbrance, the Pelletiers filed a complaint on September 24, 2009, in Newport County Superior Court, seeking temporary and permanent injunctive relief.[8] Specifically, the Pelletiers alleged that Laureanno's fence constituted "an unlawful obstruction" of the maintenance easement because it "deliberately obstruct[ed] the Pelletiers' access and travel over the easement area." The Pelletiers also alleged that the driveway agreement was not personal in nature, but instead constituted an easement that ran with the land and expanded their rights within the maintenance easement area.

Pursuant to Rule 65(a) of the Superior Court Rules of Civil Procedure,[9] the parties agreed to consolidate the hearing on the sought-after injunctive relief with a trial on the merits of the Pelletiers' complaint. A trial before a Superior Court justice occurred on October 23, 2009, in Newport County, during which both parties presented testimonial and documentary evidence. The Pelletiers' sole witness was Eileen Pelletier (Mrs. Pelletier), who testified that the Pelletiers and Laureanno were "friends" and that Laureanno had visited the Pelletiers' property "many times." On the witness stand, Mrs. Pelletier recalled the circumstances surrounding the creation of the driveway agreement and explained that, in her view, "[b]oth [the Pelletiers and the Farrises] were in agreement to draft up a permanent agreement to deed it into [their] properties." She further elaborated that the agreement was in written form because she and her husband "wanted it always to be in [their] hands that there was a permanent agreement to have [the] driveway on [their] property." Mrs. Pelletier also recounted the Pelletiers' construction of the driveway and placement of the bordering shrubbery in accordance with the driveway agreement. When questioned as to the availability of on-street parking, Mrs. Pelletier

---

7. In the letter, Laureanno also sought an acknowledgment that a separate fence, installed by the Pelletiers along the northerly boundary, was "encroaching upon [Laureanno's] property by approximately three (3) feet" and that the fence was "permissive in nature" and subject to removal upon Laureanno's request. Lastly, Laureanno sought a "written agreement in support of the future expansion of [her own] dock * * *."

8. Aside from seeking a temporary restraining order and permanent injunctive relief, the Pelletiers sought monetary damages for alleged costs incurred as a result of Laureanno's actions.

9. Rule 65(a)(2) of the Superior Court Rules of Civil Procedure provides that "[b]efore or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application."

replied that there was "street parking on the road," but that it was "difficult."

At trial, Laureanno testified that, at the time she purchased lot 5, she was aware of the maintenance easement on the property, as well as a "verbal agreement" made between the Farrises and the Pelletiers concerning the driveway. She asserted that she did not believe the "verbal agreement" to be binding upon her and that she only later discovered the existence of the written, recorded driveway agreement. Laureanno also recounted the circumstances under which she directed her attorney to send the letter in 2007.

In addition to Laureanno, the defense called Mr. Albert K. Antonio (Mr. Antonio), a title attorney, as a witness.[10] The trial justice permitted Mr. Antonio to testify, over the Pelletiers' objection,[11] about the "characteristics" in a document that he would consider when reviewing such an instrument for classification as an easement. Specifically, Mr. Antonio explained that he would examine "[w]hether * * * the document was coupled with a grant[,] such as inclusion with a deed, whether the document stated that it was to run with the land, [and] whether the document stated that it was for the benefit of not just the parties but their heirs, executors, administrators, successors and assigns." Mr. Antonio's testimony indicated that the driveway agreement did not contain language that would "cause it to run with the land," nor was the document "coupled with a grant." In his expert opinion, Mr. Antonio characterized the driveway agreement

as a license that was personal in nature as opposed to an easement. On cross-examination, Mr. Antonio did acknowledge that he was unaware of the intent of the parties upon examination of the driveway agreement and that the driveway agreement did not contain "any termination language."

Following the submission of court-ordered post-trial memoranda, the trial justice rendered his bench decision on December 18, 2009. After comprehensively reviewing the applicable law used "[i]n determining whether an interest relating to real property is a lease, easement or license," the trial justice relayed his findings of fact and conclusions of law. In regard to his credibility determinations, the trial justice found Mrs. Pelletier's testimony to be "self-serving and biased in the sense that she ha[d] an obvious interest in the outcome of [the] case." He determined Mr. Antonio's testimony to be "helpful" and "credible," but "not dispositive on the question of the [d]riveway [a]greement interpretation[,]" as that conclusion remained within the province of the court. As for Laureanno, the trial justice found that she "testified credibly that she was aware of the [d]riveway [a]greement and always considered it solely as revocable permission to use part of her land * * * as a driveway."

Viewing the driveway agreement on its face, the trial justice concluded that the Pelletiers failed to "establish[ ] by clear and convincing evidence that they were granted an easement appurtenant from [Laureanno's] predecessor-in-title." [12] The

---

**10.** Prior to the trial, the parties stipulated to Mr. Antonio's qualifications.

**11.** The trial transcript reflects that the trial justice permitted the Pelletiers to maintain a continuing objection to this line of questioning.

**12.** An easement appurtenant is defined in Black's Law Dictionary as "[a]n easement

created to benefit another tract of land, the use of easement being incident to the ownership of that other tract." Black's Law Dictionary 586 (9th ed. 2009); *see also McAusland v. Carrier,* 880 A.2d 861, 863 (R.I.2005) ("Easements appurtenant benefit property and must have both a dominant and a servient tenement.").

trial justice further found that "by its own terms within the four corners of the document, the [d]riveway [a]greement [was] a license freely revocable by [Laureanno], and * * * even if one were to find it ambiguous, there [was] no extrinsic credible evidence of the parties' intent to create an easement." In so holding, the trial justice noted that the driveway agreement was "silent as to its location on the property" and included "no language * * * expressing easement-like intent such as binding heirs, successors and assigns to the agreement." He also emphasized that, even if the driveway agreement were ambiguous, the Pelletiers had failed to shoulder "the heavy burden of proof [to establish an easement] by clear and convincing evidence[,]" because "the only evidence presented on the parties' intent or duration of the agreement was that from [Mrs.] Pelletier[,]" whose testimony the court found to be non-credible.

Final judgment was entered on December 18, 2009. The Pelletiers timely filed their notice of appeal on December 24, 2009.

## II

### Issues on Appeal

On appeal, the Pelletiers assert three errors on the part of the trial justice in formulating his decision. First, the Pelletiers maintain that the trial justice erred as a matter of law when he determined that the driveway agreement did not convey an easement because of its terminological reticence relevant to the parties' "heirs, successors and assigns." The Pelletiers contend that neither Rhode Island case law nor statutory authority require such language to establish an easement. Next, the Pelletiers aver that the trial justice erred by finding the driveway agreement to unambiguously constitute a license on its face and not an easement, in light of its terms. Lastly, the Pelletiers challenge the trial justice's credibility determination in regard to Mrs. Pelletier's testimony.

## III

### Standard of Review

■■■ "This Court will reverse the decision of a trial justice to grant or deny a permanent injunction only 'when it can be shown that the trial justice misapplied the law, misconceived or overlooked material evidence or made factual findings that were clearly wrong.'" *Hilley v. Lawrence*, 972 A.2d 643, 648 (R.I.2009) (quoting *Holden v. Salvadore*, 964 A.2d 508, 512–13 (R.I.2009)). "This Court's review of the factual findings of a trial justice sitting without a jury is deferential." *Id.* (citing *Grady v. Narragansett Electric Co.*, 962 A.2d 34, 41 (R.I.2009)). We likewise accord great deference to the trial justice's "resolution of mixed questions of law and fact, as well as the inferences and conclusions drawn from the testimony and evidence" in a nonjury case. *Nye v. Brousseau*, 992 A.2d 1002, 1008 (R.I.2010) (quoting *Houde v. State*, 973 A.2d 493, 498 (R.I.2009)). However, we apply a *de novo* review to pure questions of law that are raised on appeal. *Lamarque v. Centreville Savings Bank*, 22 A.3d 1136, 1140 (R.I.2011) (citing *Cathay Cathay, Inc. v. Vindalu, LLC*, 962 A.2d 740, 745 (R.I. 2009)).

## IV

### Discussion

■■■ Although a plaintiff in a civil action is ordinarily required to prove his or her case by only a preponderance of the evidence, a plaintiff seeking to prove an easement must instead "overcome a higher clear and convincing standard[.]" *Ondis v.*

*City of Woonsocket ex rel. Treasurer Touzin,* 934 A.2d 799, 803 (R.I.2007) (citing *Berberian v. Dowd,* 104 R.I. 585, 589, 247 A.2d 508, 510–11 (1968)). In construing an instrument purporting to create an easement, this Court must effectuate the intent of the parties. *See Carpenter v. Hanslin,* 900 A.2d 1136, 1147 (R.I.2006); *see also Hilley,* 972 A.2d at 649. Nevertheless, when the provisions of a written agreement are clear and unambiguous, such provisions "can be interpreted and applied to the undisputed facts as a matter of law" and "neither oral testimony nor extrinsic evidence will be received to explain the nature or extent of the rights acquired." *Hilley,* 972 A.2d at 649 (quoting *Carpenter,* 900 A.2d at 1147).

As explained in Restatement (Third) *Servitudes* § 2.2 at 62 (2000), "[t]he intent to create a servitude may be express or implied. No particular form of expression is required." Yet despite the outmoding of traditional "verbal formulas" associated with servitude creation in modern law, courts remain "hesitant to find the intent to create servitudes in vague language or informal writings because servitudes create interests running with the land that affect people beyond the immediate parties." *Id.* cmt. *d.* at 63. "[T]o create an easement by express grant, there must be a writing containing plain and direct language evincing the grantor's intent to create a right in the nature of an easement rather than a license." 25 Am.Jur.2d *Easements and Licenses* § 15 at 513 (2004). Moreover, the writing generally must "contain a description of the land that is to be subjected to the easement with sufficient clarity to locate it with reasonable certainty." *Id.*

A license, although considered a servitude, differs from an easement in that "a license merely confers a personal privilege to do some act or acts on the land[,]" whereas an easement "is a grant of limited use of land which burdens the servient estate for the benefit of the dominant estate[.]" 25 Am.Jur.2d *Easements and Licenses* § 2 at 498–99 (2004). In other words, "a license is a permissive use of land by which the owner allows another to come onto his or her land for a specific purpose, for a specific period of time." *Id.* at 499. "It is a personal, revocable, and unassignable privilege * * *." 25 Am. Jur.2d *Easements and Licenses* § 117 at 612 (2004). Moreover, "[t]he title of an instrument is not controlling in determining whether the right conferred is a license or an easement; rather, the intent of the parties will be the determining factor." 25 Am.Jur.2d § 2 at 499.

█ Here, the Pelletiers maintain that "[b]y law, an agreement conveys an easement appurtenant if: 1) it identifies the dominant and the subservient estates; and 2) it inures to the benefit of the dominant estate, rather than individuals." Although these factors certainly signal the creation of an easement appurtenant, the driveway agreement falls short of these "requirements," contrary to the Pelletiers' assertions on appeal. *See McAusland v. Carrier,* 880 A.2d 861, 863 (R.I.2005) (citing 7 *Thompson on Real Property* § 60.02(f) at 399 (Thomas ed. 1994)). Indeed, the driveway agreement refers to lot 4 and lot 5, but merely in the context of identifying the parties to the agreement. Specifically, the driveway agreement states that "Philip J. Pelletier and Eileen G. Pelletier are the owners of certain land located at 1771 Main Road, Tiverton, Rhode Island" and further denotes that "Paul E. Farris and Dorislee H. Farris are the record owners of the real estate located southerly of [lot 4]."[13] Significantly, the driveway agree-

---

13. Although the driveway agreement describes the Farris lot (lot 5) as southerly of the

ment stipulates that the Farrises *"desire to allow* the parties of the first part [the Pelletiers] to construct and erect a driveway on the northeasterly portion of the premises" and that the Farrises *"have no objection* to said driveway." (Emphases added.) This language is clearly permissive in nature and demonstrates the personal nature of this agreement.[14] Additionally, the driveway agreement permits the Pelletiers to construct a driveway "on the northeasterly portion of the premises." As noted by the trial justice, this description of the alleged easement area is unclear as to which premises the parties refer. *See* 25 Am.Jur.2d *Easements and Licenses* § 15.

Though mindful that no particular expression is required to create an easement, in our opinion the expressions actually articulated in the driveway agreement fall far short of demonstrating an intent to create a permanent interest—an interest that runs with the land and affects future title holders beyond the agreement's signatories. Accordingly, we conclude, as did the trial justice, that the driveway agreement is clear and unambiguous on its face.

We further hold that the instrument did not create an easement appurtenant to lot 4 as urged by the Pelletiers, but rather, established a license that was personal to the parties.[15]

■ In that regard, we likewise hold that the trial justice did not err in his consideration of the driveway agreement's paucity of wording denoting permanency—particularly, language binding the parties' "heirs, successors or assigns." Indeed, the trial justice found that "there [was] no language in the [driveway] agreement expressing easement-like intent such as binding heirs, successors and assigns to the agreement." However, the trial justice, quoting the restatements, earlier emphasized in his decision that "[t]he old insistence on use of particular words of grant, words of inheritance, and the formula 'and his assigns' * * * have almost disappeared from modern law * * * [and] [t]hat courts have abandoned the old formalism in favor of a realistic search for the parties' intent * * *." Moreover, the trial justice noted the absence of binding language as just one of several factors within the document

---

Pelletier lot (lot 4), it appears from the surveys submitted in this case that lot 5 is actually situated to the north of lot 4.

14. Equally indicative of the instrument's personal nature are the following excerpts: "Philip J. Pelletier and Eileen G. Pelletier may construct and maintain a driveway * * *;" "Philip J. Pelletier and Eileen G. Pelletier shall plant shrubs along the perimeter * * *;" "Philip J. Pelletier and Eileen G. Pelletier shall park one motor vehicle * * *;" "Philip J. Pelletier and Eileen G. Pelletier shall have the right to plant grass * * * but shall also have the right of putting a blue stone parking area or patio blocks at said driveway;" and "Philip J. Pelletier and Eileen G. Pelletier further agree to allow Paul E. Farris and Dorislee H. Farris the right of full access upon said driveway for all types of maintenance * * *."

15. We note that Laureanno contends that she held the power to revoke the Pelletiers' license in her role as the Farrises' successor-in-interest. The trial justice likewise found that the driveway agreement was "a license freely revocable by [Laureanno]." However, given the generally unassignable nature of licenses, the license established by the driveway agreement probably was not revoked by Laureanno's actions, but instead, terminated upon Laureanno's purchase of lot 5 in 1997. *See* 3 H. Tiffany, *The Law of Real Property* § 837 at 423 (1939) ("A license may * * * cease to be operative by reason of its revocation, that is, by reason of the landowner's indication of an intention to that effect, or by reason of the land having passed into the hands of a person other than the licensor."); *see also* 25 Am. Jur.2d *Easements and Licenses* § 120 at 615 (2004) ("A license does not pass with the title to the property, but is only binding between the parties * * *.").

evincing the parties' intent to create a license as opposed to an easement—including that "the [d]riveway [a]greement [was] silent as to its location on the property other than just saying the northeasterly portion" and that "[t]he document [was] simply entitled 'Agreement' and never mention[ed] the words 'license' or 'easement.'" [16] He also considered the language of the driveway agreement to be personal in nature, as it "merely state[d] the desire to allow the parties—the plaintiffs—to construct and erect a driveway."

Furthermore, we are not convinced that the trial justice hinged his analysis on the absence of binding language alone, as contended by the Pelletiers.[17] Accordingly, we view the Pelletiers' contention as premised solely on an out-of-context assessment of the trial justice's reasoning, and we deem such predication to be without merit.

 Lastly, we address the Pelletiers' argument that the trial justice erred in finding Mrs. Pelletier's trial testimony not to be credible. Particularly, the trial justice found her testimony to be "self-serving and biased in the sense that she ha[d] an obvious interest in the outcome of [the] case and [was] not credible."

The Pelletiers contend that as the only signatory of the driveway agreement to testify at trial, Mrs. Pelletier's testimony regarding the intention of the parties was highly relevant and should not have been "summarily rejected." [18] However, Mrs. Pelletier's testimony concerning the parties' intentions in framing the driveway agreement is immaterial in light of this Court's conclusion regarding the agreement's unambiguous creation of a license, and not an easement. Indeed, a review of the trial justice's decision reveals that he likewise considered her testimony, albeit non-credible, to be of no consequence, because the driveway agreement was clear and unambiguous within its four corners. It is clear to us that the trial justice reflected upon Mrs. Pelletier's testimony about the parties' intentions under a hypothetical analysis, remarking that "*even if* this document * * * was construed to be ambiguous * * * the only evidence presented on the parties' intent or duration of the agreement was that from [Mrs.] Pelletier. As noted * * *, this [c]ourt finds her testimony to be non-credible." (Emphasis added.)

 Even if this Court were to deem the driveway agreement as ambigu-

---

**16.** The trial justice also noted that the absence or presence of the words "license" or "easement" was "not dispositive."

**17.** In their pre-briefing statement submitted on appeal, the Pelletiers also cite to G.L.1956 § 34–11–27 to demonstrate that "words of inheritance" are not required to establish an express easement. We note, however, that § 34–11–27 addresses the conveyance or reservation of estates in fee simple, not servitudes.

**18.** It is well established that this Court applies "a deferential standard of review with respect to the factual findings of a trial justice sitting without a jury in a civil case." *B.S. International Ltd. v. JMAM, LLC*, 13 A.3d 1057, 1062 (R.I.2011) (citing *Costa v. Silva*, 996 A.2d 607, 611 (R.I.2010)). "We accord a substantial amount of deference to [credibility] determi-

nations, due to the fact that the trial justice 'has actually observed the human drama that is part and parcel of every trial and * * * has had an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record.'" *Id.* (quoting *In re Dissolution of Anderson, Zangari & Bossian*, 888 A.2d 973, 975 (R.I.2006)). Thus, "we 'will not disturb the findings of a trial justice sitting without a jury unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence or unless the decision fails to do substantial justice between the parties.'" *Grady v. Narragansett Electric Co.*, 962 A.2d 34, 41 (R.I.2009) (quoting *Macera v. Cerra*, 789 A.2d 890, 892–93 (R.I.2002)).

ous, which we do not, we would discern no error in the trial justice's credibility determination concerning Mrs. Pelletier's testimony and his consequent conclusion, made *arguendo*, that the Pelletiers failed to prove an intent to create an easement by clear and convincing evidence. We are mindful that under the well-settled rule originally set forth in *Gorman v. Hand Brewing Co.*, 28 R.I. 180, 183, 66 A. 209, 211 (1907), a witness's uncontroverted, positive testimony ordinarily is conclusive upon the trier of fact. Nevertheless, this Court has held "that a trial justice may refuse to accept the uncontroverted testimony of proffered witnesses" under certain circumstances. *Paradis v. Heritage Loan and Investment Co.*, 701 A.2d 812, 813 (R.I.1997) (mem.) (citing *Laganiere v. Bonte Spinning Co.*, 103 R.I. 191, 194, 236 A.2d 256, 258 (1967)). "[F]or example, positive uncontroverted testimony may be rejected if it contains inherent improbabilities or contradictions, which alone, or in connection with other circumstances, tend to contradict it." *Laganiere*, 103 R.I. at 194, 236 A.2d at 258. "Such testimony may also be disregarded if it lacks credence or is unworthy of belief, * * * especially if the testimony is that of a party to the litigation or of an interested witness." *Id.* at 194–95, 236 A.2d at 258. "Rejection on credibility grounds may not, however, be arbitrary or capricious, nor may it ' * * * be left to the whim of a trier of fact[.]' " *Id.* at 195, 236 A.2d at 258 (quoting *Michaud v. Michaud*, 98 R.I. 95, 99, 200 A.2d 6, 8 (1964)). "Moreover, a trier of fact who disregards a witness's positive testimony because in his [or her] judgment it lacks credibility should clearly state, even though briefly, the reasons which underlie his [or her] rejection." *Id.* (citing *Jackowitz v. Deslauriers*, 91 R.I. 269, 276, 162 A.2d 528, 531 (1960)).

We are of the opinion that the trial justice was justified in his rejection on credibility grounds of Mrs. Pelletier's testimony regarding the parties' intent in executing the driveway agreement. The trial justice determined that Mrs. Pelletier—both a party to the litigation and an interested witness—provided testimony that, in his view, was unworthy of belief. *See Laganiere*, 103 R.I. at 194–95, 236 A.2d at 258. In choosing to reject Mrs. Pelletier's uncontroverted testimony, the trial justice expressly stated his reasons for doing so—namely, that her testimony was "not credible," "self-serving," and "biased." *See Michaud*, 98 R.I. at 99, 200 A.2d at 8. Conferring the requisite substantial deference to the trial justice's credibility determination at issue, we do not perceive his rejection on credibility grounds as arbitrary or in error. Accordingly, the plaintiffs' contention centered on this basis is unavailing.

## V.

### Conclusion

For the reasons stated in this opinion, we affirm the judgment of the Superior Court. The record may be remanded to the Superior Court.